FILED

Feb 10 2016

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ RhondaU          DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MOORE, an individual, | CASE NO. 14cv2361-LAB(KSC) |
| Plaintiff, | REPORT AND RECOMMENDATION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| vs. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | [Doc. Nos. 14 and 19] |
| Defendant. | |

Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying him disability insurance benefits.[1] Pursuant to Title 28, United States Code, Section 636(b)(1)(B), and Civil Local Rules 72.1(c)(1)(c) and 72.2(a), this matter was assigned to the undersigned Magistrate Judge for a Report and Recommendation.

Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc. No. 14]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 19];

---

[1]     Title 42, United States Code, Section 405(g), provides as follows: "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action ... brought in the district court of the United States.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive."

1  (3) defendant's Response in Opposition to Plaintiff's Motion [Doc. No. 18];
2  (4) plaintiff's Reply to defendant's Opposition [Doc. No. 20]; and (5) the
3  Administrative Record [Doc. Nos, 10, 11, 12].  After careful consideration of the
4  moving and opposing papers, as well as the Administrative Record and the applicable
5  law, this Court RECOMMENDS that the District Court remand the case for further
6  consideration by the Commissioner pursuant to the "fourth sentence" of Section 405(g)
7  and enter a final judgment.  *Melkonyan v. Sullivan*, 111 S.Ct. 2157 (1991); *Sullivan v.*
8  *Finkelstein*, 110 S.Ct. 2658 (1990).

9  <u>***Background and Procedural History***</u>

10  On October 4, 2010, plaintiff filed an application for supplemental security
11  income (SSI).  [Doc. No. 10-5, at pp. 4-12.] Plaintiff's applications states that he was
12  born on August 20, 1964.  He claims his disability began on May 1, 1995. [Doc. No.
13  10-5, at p. 4.] From March 1985 through May 1995, plaintiff was enlisted in the Marine
14  Corps. [Doc. No. 10-5, at p. 6; Doc. No. 10-6, at p. 57.] While serving in the Marine
15  Corps, plaintiff received the following awards:  Navy Achievement Medal, Good
16  Conduct Medals, and the National Defense Medal. [Doc. No. 12-4, at p. 94.]

17  Plaintiff's job in the Marine Corps was helicopter crew chief, which involves
18  physical labor, aircraft inspection, maintenance, and repair.  [Doc. No. 10-5, at p. 6;
19  Doc. No. 10-6, at p. 57.] In 1995, while in the Marine Corps, plaintiff was involved in
20  a helicopter crash.  As a result of the crash, he needed surgery to address damage to his
21  right heel.  He also sustained damage to both knees and a compression fracture of his
22  lower back.  In May 1995, plaintiff was medically discharged from the military. [Doc.
23  Nos. 10-6, at pp. 39-40, 57, 84; 10-8, at pp. 65-66; 72, 79.]

24  At the time plaintiff filed his SSI application in 2010, a face-to-face examiner
25  noted he walked with the aid of a cane. [Doc. No. 10-6, at pp. 3, 12.] Medical
26  conditions listed on plaintiff's SSI application included anxiety, heel injury, and "right
27  leg nerve damage into lower back." [Doc. No. 10-6, at p. 6.]
28  / / /

1    Since plaintiff was medically discharged from the Marine Corps in May 1995,
2    he has had not any formal, verifiable employment. The SSI examiner explained that
3    plaintiff's "date last insured" was 2000. Plaintiff asked "what if he had been
4    working?" and mentioned "a security company." [Doc. No. 10-6, at p. 12.] The
5    examiner explained to plaintiff that there were no verifiable wages on his record since
6    1995. As a result, the examiner indicated plaintiff's "date last insured" would not
7    change unless plaintiff could prove he had been working. In addition, the employer
8    would have to pay taxes. The examiner asked if he had been paid "under the table,"
9    and plaintiff said, "No." [Doc. No. 10-6, at p. 12; Doc. No. 10-5, at pp. 13-17.]

10    Other information in the record indicates plaintiff was living with a girlfriend for
11    about ten years after he was discharged from the military (*i.e.*, from some time in 1995
12    through August 2010). The girlfriend owned land and was the co-owner of a sanitation
13    company. Plaintiff essentially had an informal employment arrangement with her and
14    was able to use a cart provided to him by the Department of Veterans Affairs to
15    function as a ranch hand. He could get around with the cart to "ride the fences," feed
16    horses, take care of livestock, and wash cars. [Doc. No. 10-2, at pp. 57-58.] Plaintiff
17    also indicated he worked at the sanitation company as a security officer, and in 2006,
18    he helped with the payroll and office work. However, the girlfriend lost the property
19    in 2010. [Doc. No. 10-2, at pp. 57-58; Doc. Nos. 12-2, at pp. 168; Doc. No. 12-3, at
20    pp. 8-9; Doc. No. 12-4, at pp. 2, 6.]

21    Plaintiff was homeless beginning March 1, 2010. [Doc. No. 10-5, at p. 5.] On
22    September 8, 2010, shortly before plaintiff filed his application for SSI, the Department
23    of Veterans Affairs notified plaintiff by letter that he was entitled to compensation of
24    10 to 30 percent for service-connected disabilities. [Doc. No. 10-4, at pp. 2, 6.] On his
25    SSI application, plaintiff reported receiving $242 per month in benefits from the
26    Department of Veterans Affairs. [Doc. No. 10-5, at pp. 2, 6.] However, on April 4,
27    2014, plaintiff's compensation for his service-connected disabilities was increased to
28    80 percent or $1,525.55 per month beginning March 1, 2014, because a review of his

1   service records indicated his "depressive disorder" was related to his military service.

2   [Doc. No. 10-6, at pp. 63-71; Doc. No. 10-2, at pp. 54-55.]

3        On December 16, 2010, plaintiff's application for SSI was denied. [Doc. No. 10-

4   4, at p. 2.] He requested reconsideration on February 16, 2011 [Doc. No. 10-4, at p. 7],

5   but his request was denied on June 2, 2011 [Doc. No. 10-4, at p. 10]. On August 14,

6   2012, plaintiff requested a hearing before an administrative law judge. [Doc. No. 10-6,

7   at pp. 63-71.] A hearing before an administrative law judge was held on April 10, 2014.

8   [Doc. No. 10-2, at p. 42.]

9        On May 19, 2014, the ALJ issued a written opinion concluding that plaintiff did

10   not qualify for disability insurance benefits under the SSA. In reaching this decision,

11   the ALJ found that plaintiff has the severe impairments of drug and alcohol abuse; post

12   traumatic stress disorder ("PTSD"); personality disorder; depression; knee arthralgia;

13   lumbar spine compression fracture history; history of heel injury; history of seizures;

14   and osteopenia. However, when plaintiff is not abusing drugs or alcohol, the ALJ

15   concluded he would not have an impairment or combination of impairments that meet

16   SSA disability criteria and, as a result, would have the residual functional capacity to

17   perform a full range of light work with minimal interaction with supervisors, coworkers

18   and the public. [Doc. No. 10-2, at pp. 21-30.]

19        On June 26, 2014, plaintiff requested review of the ALJ's decision by the

20   Appeals Council. [Doc. No. 10-2, at pp. 11.] However, on August 5, 2014, the Appeals

21   Council denied plaintiff's request for review. [Doc. No. 10-2, at pp. 2-4.]

22                           ***Discussion***

23   **I.   *Standards of Review*.**

24        Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant

25   summary judgment if the movant shows that there is no genuine dispute as to any

26   material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.

27   56(a). "Summary judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the

28   use of evidentiary material in the form of affidavits, depositions, answers to

1 interrogatories, and admissions.  In Social Security appeals, however, the Court may

2 'look no further than the pleadings and the transcript of the record before the agency,'

3 and may not admit additional evidence. *Morton v. Califano*, 481 F.Supp. 908, 914 n.

4 2 (E.D.Tenn.1978); 42 U.S.C. § 405(g). "[A]lthough summary judgment motions are

5 customarily used [in social security cases], and even requested by the Court, such

6 motions merely serve as vehicles for briefing the parties' positions, and are not a

7 prerequisite to the Court's reaching a decision on the merits." *Kenney v. Heckler*, 577

8 F.Supp. 214, 216 (D.C. Ohio 1983).

9 **II.**   ***Medical Evidence.***

10     **A.**     ***Disability Determinations by the Department of Veterans Affairs.***

11       The record includes a letter from the Department of Veterans Affairs dated

12 September 8, 2010 stating that plaintiff was "entitled to compensation for service-

13 connected disability(ies) rated at least 10 percent, but less than 30 percent." [Doc. No.

14 10-5, at p. 2.] Plaintiff's medical records indicate this disability rating was related to

15 physical injuries plaintiff sustained in the 1995 helicopter crash.

16       In a letter dated April 4, 2014 from the Department of Veterans Affairs, plaintiff

17 was awarded an increase in his disability rating to 80 percent, with 70 percent

18 attributed to "depressive disorder." [Doc. No. 10-6, at p. 64.] The record includes an

19 analysis of the medical and other evidence used to make this disability determination,

20 the details of which are discussed more fully below. [Doc. No. 10-6, at pp. 63-70.]

21     **B.**     ***Medical Treatment Records from the Veterans Administration***

22              ***Healthcare System.***

23       The Administrative Record in this case is unusually large (2,609 pages). Most

24 of the documents in the Administrative Record are plaintiff's treatment records from

25 the Veterans Administration Healthcare System from 2003 through 2014.  The records

26 are not in chronological order.  In addition, they were printed in a manner that makes

27 it difficult to determine when one medical record ends and another begins.  As a result,

28 it was difficult and very time consuming to review the records.

1    Even though plaintiff claims his disability began on or about May 1, 1995 after

2    he was involved in a helicopter crash while he was in the Marine Corps, there are no

3    records prior to 2003. [Doc. No. 10-1, at pp. 1-5.] The record does indicate that

4    plaintiff attempted to obtain prior records from Balboa Naval Hospital, where he had

5    surgery on his heel after the helicopter crash in 1995, but was unable to do so. [Doc.

6    No. 11-3, at pp. 38, 43, 46.]

7    The following is a brief, chronological summary of plaintiff's extensive

8    treatment records from the Veterans Administration Healthcare System.

9              *1.    Medical Treatment Records from 2003 through 2008.*

10    From 2003 through 2008, plaintiff was treated through the Veterans

11    Administration Loma Linda Healthcare System. The record includes a large number

12    of medical records from this time period. Some of these records are medication and/or

13    medical testing notations for particular dates with no corresponding treatment notes.

14    [Doc. No. 12-1, at pp. 1-204; Doc. No. 12-2, at pp. 1-195; Doc. No. 12-3, at pp. 1-189;

15    Doc. No. 12-4, at pp. 1-99.]

16    During his initial visit with an internist on October 6, 2003, plaintiff explained

17    he had injured his right heel and leg in a helicopter crash in 1995 and had surgery at

18    Balboa Naval Hospital to repair nerve damage. He complained he was tired and had

19    constant pain in his back and his right leg, ankle, and heel. [Doc. No. 12-4, at p. 6.] At

20    this time, he indicated he was unemployed and was living with a friend. [Doc. No. 12-

21    4, at p. 6.] He also admitted alcohol dependence and had symptoms of depression,

22    including an inability to experience pleasure, insomnia, feelings of worthlessness,

23    indecisiveness and/or inability to concentrate. [Doc. No. 12-4, at pp. 6-9.] In addition,

24    he admitted he had previously had suicidal thoughts. [Doc. No. 12-4, at p. 9.]

25    On October 23, 2004, plaintiff "blacked out" while driving home from a grocery

26    store and hit another car. He was taken to the hospital for evaluation. At the hospital,

27    he denied having an alcohol problem and denied alcohol use that day. He could not

28    recall the details of the accident. A CT scan "found L spine fractures, undetermined

age." [Doc. No. 12-3, at p. 189.] On October 26, 2004, plaintiff left his hospital room and went to the roof to smoke a cigarette without alerting staff. While on the roof, plaintiff said he felt dizzy and "blacked out," which resulted in a fall of about 12 feet. As a result of the fall, he sustained an orbital fracture and lacerations to his arms. Hospital personnel believed the fall from the roof was a suicide attempt, but plaintiff denied being depressed or suicidal. During this hospital stay, plaintiff had "significant pain" and was treated with pain medication and a "back immobilizer."[Doc. No. 12-3, at pp. 171, 189; Doc. No. 12-4, at p. 2.]

A psychiatrist who evaluated plaintiff while he was in the hospital concluded he was minimizing his alcohol use. The psychiatrist also concluded plaintiff's behavior was consistent with addiction, but plaintiff was not amenable to treatment. [Doc. No. 12-3, at pp. 174, 181-183, 189.] While he was in the hospital, plaintiff indicated he was living with a girlfriend in Lake Elsinore. He also said he was unemployed but had been a security officer for a security company since 1996. [Doc. No. 12-4, at p. 2; Doc. No. 12-4, at p. 6.] Plaintiff was discharged from the hospital on or about November 13, 2004. [Doc No. 12-3, at p. 161.]

In February 2005, plaintiff went to the VA Emergency Department complaining of "severe back pain" since his prior injury. By this time, he had already been to several different hospital emergency departments in the area complaining of pain, and he had been given a prescription for pain medication. [Doc. No. 12-3, at pp. 145, 151.] An x-ray of plaintiff's lumbar spine indicated plaintiff's old compression fractures were "most likely the source of the pain." [Doc. No. 12-3, at p. 142.] However, the Progress Notes indicate a concern with prescribing Vicodin for pain because of "elevated liver function that may be the result of cirrhosis from alcohol use." [Doc. No. 12-3, at p. 142.] Plaintiff was "strongly advised to stop all use of alcohol due to this liver impairment." [Doc. No. 12-3, at p. 142.] However, the record indicates plaintiff entered into a pain management agreement at this time, so that he could regularly receive pain medications for his back pain. [Doc. No. 12-3, at pp. 144-145.]

From May 10, 2006 to May 28, 2006, plaintiff was hospitalized at the VA Hospital in Loma Linda, where he was treated for medical problems believed to be related to alcohol abuse. When he arrived at the hospital, he said he had been having abdominal pain and vomiting for five days. He was treated for alcoholic ketoacidosis, acute pancreatitis, anemia, and delirium. He also developed respiratory failure, pneumonia, and septic shock. [*See generally* Doc. Nos. 12-1, at pp. 1-204; 12-2, at pp. 1-195; 12-3, at pp. 1-136] As a result of his condition, plaintiff was psychiatrically monitored in the hospital. During a psychiatric evaluation, plaintiff said he had been living with his girlfriend for the past ten years but could not go back there so he is homeless. He also said the girlfriend was a co-owner of a sanitation company in Lake Elsinore known as Right Way. He had been working for the company for twelve years and hoped to return there after being released from the hospital. His hours were generally 8 a.m. to 5:00 p.m. [Doc. No. 10-2, at pp. 57-58; Doc. Nos. 12-2, at p. 168; Doc. No. 12-3, at pp. 8-9; Doc. No. 12-4, at pp. 2, 6;.] During psychiatric evaluations, plaintiff denied alcohol abuse and said he had no need for a treatment program. [Doc. No. 12-2, at pp. 190, 195.]

As of March 26, 2007, the record indicates plaintiff had been diagnosed with debility[2] and was living in a convalescent home. He was using a walker, needed assistance for ambulation, and complained of muscle weakness and constant pain in his feet, knees, and hips. [Doc. No. 12-2, at pp. 132-139.] An MRI of the lumbar spine on May 10, 2007 revealed "[m]ultilevel central compression deformities;" "minimal bulging;" and osteoarthritis. [Doc. No. 12-1, at pp. 59-71.] The convalescent home and the VA were both providing physical therapy. Plaintiff was also being treated with pain medications and caudal block/epidural steroid injections. On July 26, 2007, plaintiff indicated his pain was "almost resolved" by steroid injections. On August 30,

/ / /

---

[2] "Debility: physical weakness caused by illness or old age." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/debility.

14cv2361-LAB(KSC)

1   2007, plaintiff was officially discharged from physical therapy. [Doc. No. 12-1, at pp.

2   56-62; Doc. No. 12-2, at pp. 51-139.]

3                 2.     *__2010 Medical Treatment Records__*.

4         On August 19, 2010, plaintiff went to a VA facility in San Diego for orientation

5   to vocational service/education. About 10:00 p.m., he was in a rest room and felt

6   lightheaded. The next thing he remembered was waking up on the floor feeling sore

7   with a headache on the right side of his head. He was unsure whether he hit his head.

8   He then checked into the Emergency Department, where he indicated he had similar

9   episodes in 2005 and/or 2006. The examining physician concluded plaintiff possibly

10   had a seizure brought on by sleep deprivation. Plaintiff had not slept over the last 100

11   hours since his arrival in San Diego. The examining physician scheduled a

12   consultation with a neurologist and an MRI/EEG and referred plaintiff to a social

13   worker for assistance with obtaining shelter. [Doc. No. 10-7, at pp. 77, 81-87.]

14   Arrangements were made for plaintiff to obtain shelter at St. Vincent de Paul on

15   August 27, 2010. [Doc. No. 10-7, at p. 76.] In a separate report, a neurologist stated

16   that an EEG was completed on August 19, 2010 but the results were "within normal

17   limits." [Doc. No. 10-9, at p. 39.]

18         On August 21, 2010, plaintiff went to the VA Emergency Department

19   complaining of chest, knee, hip, and ankle pain. He had been in Tijuana and believed

20   he had been kicked and beaten up when he was "down" from a seizure. [Doc. No. 10-7,

21   at pp. 69-70.] Witnesses saw plaintiff fall to the ground. They also noticed other

22   symptoms, such as shaking, exhaling, urinary incontinence, and excessive swallowing.

23   He may have hit his head. Plaintiff was examined, treated for pain, and released. [Doc.

24   No. 10-7, at pp. 69-76.]

25         An MRI and EEG were completed on August 23, 2010, and Dilantin was

26   prescribed to control seizures. The staff psychiatrist described plaintiff as anxious and

27   fearful and believed he might have panic disorder or PTSD. He was under a lot of

28   stress because he did not have shelter and was afraid of having another seizure.

1    Although he was seeking admission to the hospital by claiming he was suicidal, the

2    psychiatrist concluded he did not meet the criteria for admission. [Doc. No. 10-7, at pp.

3    57-68.] The MRI revealed a "[n]ormal brain for age" and "[n]o evidence for seizure

4    focus." [Doc. No. 10-7, at pp. 205-206.]

5       Plaintiff went to the Emergency Department again on September 13, 2010

6    complaining of severe pain in his foot, ankle, and knee. He had noticed some swelling

7    and believed he may have injured himself about one and one-half weeks before when

8    he had a seizure. [Doc. No. 11-2, at p. 80.] The examiner noted some swelling and

9    tenderness but there was "no acute fracture or dislocation." [Doc. No. 11-2, at p. 82.]

10   Plaintiff was discharged with prescriptions for Naproxen and Vicodin to address pain.

11   [Doc. No. 11-2, at p. 83.]

12       On September 27, 2010, plaintiff enrolled as a new patient at the VA's Mission

13   Valley Clinic and was screened by a nurse practitioner. [Doc. No. 10-7, at pp. 30-36.]

14   The nurse screened plaintiff for depression, pain, alcohol abuse, and PTSD. Plaintiff's

15   scores were "suggestive of moderate depression," positive for high level of constant

16   pain, negative for alcohol abuse, and positive for PTSD. [Doc. No. 10-7, at p. 35.]

17       On September 29, 2010, plaintiff went to the VA's Mission Valley Clinic

18   seeking an appointment with a primary care physician. He smelled strongly of alcohol

19   and acted inappropriately. An appointment was booked for October 19, 2010. [Doc.

20   No. 10-7, at p. 26.]

21       On October 5, 2010, plaintiff went to the VA Emergency Department

22   complaining of uncontrolled chronic leg and foot pain since he ran out of his

23   prescription for Vicodin three days ago. He was given prescriptions for Naproxen and

24   Vicodin. [Doc. No. 10-17, at pp. 23-26.]

25       On October 19, 2010, plaintiff saw a primary care provider for the "first time . . .

26   after being vested in the VA this August." [Doc. No. 10-7, at p. 14; Doc. No. 11-2, at

27   p. 52.] Plaintiff's primary complaint was uncontrolled pain in his right foot that has

28   been chronic since the helicopter accident. Pain has been uncontrolled since he ran out

1    of his prescription for Vicodin and was unable to get it filled. [Doc. No. 10-7, at p. 15.]

2    He had a slight limp and used a cane to walk because he did not feel steady without it.

3    [Doc. No. 10-7, at pp. 16-17.] Plaintiff was referred to the "neuro clinic" for pain

4    management" and to the "psych clinic" for anxiety management.   Plaintiff's

5    prescription for Vicodin was renewed. [Doc. No. 10-7, at pp. 19-20.] Depression and

6    PTSD screening were deferred because of time constraints but the doctor noted there

7    was a need for review given prior "psych eval" in August 2010. [Doc. No. 10-7, at p.

8    20.]

9         Plaintiff went to the VA clinic on November 5, 2010 and had an "unscheduled"

10   visit with a nurse.  He told the nurse he had been trying to reach his primary care

11   physician.  He had been shivering and having cold sweats and believed these were

12   "grand mal seizures" as he had been out of his dilantin (seizure medication) for a day.

13   [Doc. No. 10-7, at p. 194.] He also requested a one week supply of Vicodin and

14   admitted to taking more than prescribed because of "increased pain." [Doc. No. 10-7,

15   at p. 194.] The nurse spoke with the primary care physician who declined to authorize

16   a partial prescription for Vicodin but agreed to renew plaintiff's prescriptions for

17   Naproxen and Dilantin. [Doc. No. 10-7, at pp. 194-195.]

18        On November 12, 2010, plaintiff's primary care physician placed an addendum

19   in plaintiff's records stating he should not be given a refill for Vicodin until

20   December 18, 2010. Plaintiff had been given a prescription for a two-month supply of

21   Vicodin on October 19, 2010. Based on his requests for refills on November 5 and 10,

22   2010, it appeared plaintiff had used a 60-day supply of this medication in a short time

23   period and could be "abusing this medication." [Doc. No. 11-2, at p. 58.] However, a

24   second addendum on November 18, 2010 states that plaintiff was contacted by

25   telephone. He reported that his chronic pain had worsened and he was not able to reach

26   a tolerable level of pain without ingesting a larger dose of his medication. As a result,

27   the primary care physician discontinued plaintiff's prescription for Vicodin and gave

28   him a prescription for Percocet. [Doc. No. 11-2, at p. 59.]

1      On December 1, 2010, plaintiff reported to a primary care physician that his

2  chronic pain issues were "continuing to slowly worsen." [Doc. No. 10-7, at p. 181;

3  Doc. No. 11-3, at p. 18.] He also wished "to see someone to discuss his depression."

4  [Doc. No. 10-7, at p. 181.] The physician's notations in the health summary for this

5  examination indicate plaintiff was ambulating without difficulty but had a slight limp

6  and was using a cane and wearing a large back brace. The muscles in his back were

7  very tense, and he could not bend forward at the hips without significant pain. [Doc.

8  No. 10-7, at pp. 181-187.] At this time, plaintiff was living at St. Vincent de Paul and

9  had been there since August 2010. He denied alcohol and drug abuse. The physician

10  decided to "defer" to neurology for continued pain management and to psychiatry for

11  management of mental health issues but agreed to continue a prescription for

12  Propranolol to address anxiety and a prescription for Percocet for pain. The physician

13  also referred plaintiff to podiatry and ordered spinal x-rays and a bone density

14  evaluation.  Spinal and bone density irregularities were noted in the results of these

15  evaluations.  Plaintiff was walked to the mental health clinic to schedule a mental

16  health evaluation and screening for depression and PTSD. [Doc. No. 10-7, at pp. 181-

17  187.]

18      Plaintiff also appeared on December 1, 2010 for a Compensation and Pension

19  Examination. The staff physician who examined plaintiff noted that he had a disability

20  rating of 20 percent for "neuralgia of internal popliteal nerve."[3] [Doc. No. 10-7, at p.

21  135.] At the time of the examination, the staff physician did not have access to

22  plaintiff's claim file, and he noted that plaintiff was "a somewhat poor medical

23  historian" as he did not know the reason for his heel surgery after the helicopter crash.

24  However, the staff physician presumed the surgery was for "persistent pain due to

26      [3]      "Neuralgia" is "acute paroxysmal pain radiating along the course of one
or more nerves usually without demonstrable changes in the nerve structure."
27  Merriam-Webster Medical Dictionary, http://www.merriam-webster.
com/dictionary/neuralgia. "Popliteal" means "of or relating to the back part of the leg
28  behind the knee joint." Merriam-Webster Medical Dictionary, http://www.merriam-
webster.com/dictionary/popliteal.

neuroma formation."[4] [Doc. No. 10-7, at p. 135.] Plaintiff told the staff physician he continued to have "severe pain in the right heel, which . . . travels up the right lower extremity and 'joins with' the chronic back pain which he has had as a result of the compression fracture. He wears a hard corset because of the back pain." [Doc. No. 10-7, at p. 135.] Plaintiff claimed his pain is severe (beyond 10 on a scale of 1 to 10) but is reduced to 7 out of 10 with the use of Percocet taken three times per day. "The Percocet recently replaced the Vicodin which he had been taking." [Doc. No. 10-7, at p. 135.] The staff physician did not order any diagnostic or clinical tests but reached the following diagnosis: "Chronic right heel pain following trauma. This pain originates in the distribution of the calcaneal branches of the sural and tibial nerves." [Doc. No. 10-17, at p. 136.]

Radiology reports dated December 6, 2010 noted irregularities in plaintiff's spine, including compression fractures with "resultant focal kyphosis,"[5] "diffuse osteopenia,"[6] and "[i]irregularity of the endplates at the mid-lower thoracic spine." [Doc. No. 10-7, at pp. 199-202.] However, the reports state that: "No compromise of the spinal canal is visualized." [Doc. No. 10-7, at p. 200.] X-rays of plaintiff's hip and right knee revealed "[d]iffuse osteopenia" but "[n]o acute osseous injury." [Doc. No. 10-7, at pp. 201-202.]

On December 6, 2010, plaintiff reported to the VA Emergency Department and said he had a seizure while at a restaurant the day before. He was having severe right

---

[4] "Neuroma" is defined as: "1: a tumor or mass growing from a nerve and usually consisting of nerve fibers; 2: a mass of nerve tissue in an amputation stump resulting from abnormal regrowth of the stumps of severed nerves – called also *amputation neuroma*. Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/neuroma.

[5] "Kyphosis" means "exaggerated outward curvature of the thoracic region of the spinal column resulting in a rounded upper back." Merriam-Webster Dictionary, http://c.merriam-webster.com/medlineplus/kyphosis.

[6] "Osteopenia" is "reduction in bone volume to below normal levels especially due to inadequate replacement of bone lost to normal lysis." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/osteopenia. "Lysis" refers to "gradual decline" or "disintegration." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/lysis.

14cv2361-LAB(KSC)

knee pain, and the knee was slightly swollen.  Witnesses to the seizure told plaintiff that he was shaking, his right knee buckled, and he fell to the ground, possibly injuring his knee when it "bent unnaturally" during the seizure.  He had been on Dilantin for seizures since September 2010 and had been taking his medication regularly. [Doc. No. 11-3, at pp. 11, 13-15.] He was medicated for pain with Torradol and given a "patella stabilizer" for a sprained knee. [Doc. No. 11-3, at p. 11-12.] Once his pain was relieved and he was wearing the stabilizer, he was able to ambulate out of the Emergency Department with "no distress." [Doc. No. 11-3, at p. 12.]

On December 22, 2010, plaintiff was seeking an early refill of his pain medication (oxycodone/acetaminophen) from the VA Clinic. He reported taking "up to 18 tablets a day" because of a recent increase in pain and also using Ibuprofen. He suspected someone had been taking his pain medications from his personal belongings at the St. Vincent de Paul shelter where he was living. [Doc. No. 11-3, at p. 5.]  A nurse advised plaintiff there would be no early or partial refill of his pain medication "per MD directive." [Doc. No. 11-3, at p. 5.]

Plaintiff was living at Father Joe's Village as of December 30, 2010. [Doc. No. 11-3, at p. 3; Doc. No. 10-9, at pp. 13-14.] At this time, he consulted with a VA podiatrist because of "right heel pain since 1995 when he sustained a severe injury to his heel while serving as a crew chief on a helicopter." [Doc. No. 11-3, at p. 3.] The podiatrist recommended "night splints" and "Sorbothane heel pads." [Doc. No. 11-3, at p. 3.]

### 3. *2011 Medical Treatment Records.*

As a result of inappropriate behavior in the Mission Valley VA Clinic on October 12, 2010, plaintiff had a psychology consult on January 5, 2011 with a staff psychologist, who explained behavioral requirements for receiving treatment at the clinic. At this time, plaintiff's responses to a health questionnaire were indicative of "severe depression." [Doc. No. 10-9, at pp. 21-24.] He adamantly denied alcohol use and said he may have smelled like alcohol when he came to the clinic because he

1  collects cans and sometimes alcohol pours out of the cans onto his clothing. [Doc. No.
2  10-9, at p. 21.] The psychologist noted plaintiff's thoughts appeared logical, but he
3  seemed "prone to distractability" and his mood was "depressed." [Doc. No. 10-9, at p.
4  23.] At this time, plaintiff was taking Percocet for chronic pain in his back, ankles, and
5  feet. The psychologist educated plaintiff about the safe use of this medication and the
6  importance of taking it as directed. She also encouraged plaintiff to keep a pain diary
7  to bring to his next appointment. [Doc. No. 10-9, at p. 23.]
8       On February 18, 2011, plaintiff was "hanging around the clinic" urgently
9  requesting an appointment, because he was "in a lot of pain." [Doc. No. 10-7, at p. 189;
10  AR 926-928.][7] He approached his primary care physician in the café while she was
11  getting her lunch to request pain medication. She advised plaintiff that she was unable
12  to write him any more prescriptions as he had been referred to a pain management
13  program because of his "narcotic seeking behavior." [Doc. No. 10-7, at p. 189.] The
14  pain management program had attempted to contact plaintiff on several occasions but
15  did not have accurate contact information and had been unable to reach plaintiff.
16  Plaintiff said, "I don't have a phone – I'm homeless." [Doc. No. 10-7, at p. 189.] The
17  physician advised plaintiff that he should go directly to the "La Jolla facility" via
18  shuttle to make contact with a physician involved in the pain management program.
19  However, the physician wrote in her notes that plaintiff chose to "disregard" her advice
20  and sat in the waiting room instead of taking the shuttle to the La Jolla facility. [Doc.
21  No. 10-7, at pp. 189-190.]
22       On March 1, 2011, plaintiff went to the VA's Emergency Department seeking
23  a refill of his pain medication. He said he recently ran out of medication and was
24  unable to reach his primary care physician. The staff physician in the Emergency
25  Department noted plaintiff last picked up his prescription refills on January 27, 2011.
26  She gave plaintiff a refill for a 7-day supply of Vicodin for pain and reminded plaintiff
27
28       [7]  "AR" refers to the Administrative Record. The "AR" references are used
to refer to documents AR 900 through 1012, because these documents are in the
Administrative Record but are missing from the Court's docket.

1   to keep his appointment with his primary care physician on March 7, 2011. [AR 924-
2   925.] In response to the Vicodin refill in the Emergency Department, plaintiff's primary
3   care physician placed an alert in plaintiff's medical records stating that no narcotics
4   should be prescribed to plaintiff without her prior approval or the approval of a pain
5   management specialist who had been assigned to address pain management. [AR 925.]

6        During a visit with his primary care physician on March 7, 2011, plaintiff
7   expressed a belief that his current knee pain is "service connected" because it is related
8   to his abnormal gait resulting from his heel injury.  The primary care physician told
9   plaintiff she would not be able to make this determination and referred plaintiff to
10  member services to find out "how one goes about adjusting and/or getting their [service
11  connected] disabilities reviewed and/or changed." [AR 917.] However, she suggested
12  that a podiatrist might be able to determine if the knee pain is related to the heel injury
13  and advised plaintiff he did not need an "ortho referral . . . for this to happen." [AR
14  916.]  Plaintiff was also given a referral to physical therapy to address his knee pain.
15  [AR 917.] For pain medication, plaintiff was referred to a pain specialist/pain
16  management program "given [his] narcotic seeking behavior."  [AR 917-920.]

17       On March 7, 2011, plaintiff also had an initial consultation with a pain specialist
18  who completed a "medication reconciliation."  At this time, it was determined that
19  plaintiff was taking Dilantin for seizures and  Propranolol for anxiety. [AR 919-920.]
20  Plaintiff reported he had been sober for 55 days and wanted to be serious about his pain
21  management.   The pain specialist discussed the need to take the right type of
22  medications for pain and emphasized he would not recommend narcotics as part of
23  plaintiff's pain management plan.  Instead, the pain specialist discontinued plaintiff's
24  prescription for Percocet and prescribed Gabapentin to address plaintiff's pain. [AR
25  921.]
26  / / /
27  / / /
28  / / /

1    Plaintiff attended a group counseling session on March 9, 2011 to be screened
2   for PTSD.  He indicated he was interested in participating in a treatment program
3   offered by the VA, and an intake appointment was scheduled for May 10, 2011. [Doc.
4   No. 10-7, at pp. 140-141.]

5    On March 15, 2011, plaintiff had a follow-up appointment with the pain
6   specialist.  At this time, the pain specialist increased the dosage of plaintiff's
7   prescription for Gabapentin, which he had been taking for about a week with "some
8   changes in pain." The specialist also prescribed Meloxicam in addition to Gabapentin
9   for pain relief. [Doc. No. 10-7, at p. 139.]

10    On March 28, 2011, plaintiff spoke to a nurse at the walk-in VA Clinic about his
11   current circumstances.  The nurse provided him with information about the VA
12   Supportive Housing program (VASH).  Although she put plaintiff's name on the
13   interest list for VASH, she also encouraged him to "explore other housing options,"
14   and she gave him information about other resources. [AR 905-907.]

15    During his next visit to the pain management specialist on April 4, 2011,
16   plaintiff reported he had been sober for two months, and the increase in Gabapentin
17   was "helping his pain." [AR 904.] However, he reported "new popping and tearing of
18   his [left] knee after an incident on the trolley." [AR 904.] The pain specialist continued
19   the prescription for Gabapentin at the same dosage but increased the dosage of
20   Meloxicam. [AR 904.]  The progress notes indicate plaintiff was "compliant with his
21   current pain meds for the most part except report[ed] taking 1200 mg Gabapentin 2
22   times." [AR 904.]

23    On April 28, 2011, plaintiff spoke to a nurse at the VA Clinic and requested
24   information on getting into the alcohol treatment program. He said he drank alcohol
25   while living at St. Vincent de Paul.  He woke up in jail and did not remember what
26   happened.  His case manager at St. Vincent de Paul would not tell him anything.  The
27   nurse contacted a liaison at St. Vincent de Paul, who read a discharge report to
28   plaintiff.  The report stated that security guards unsuccessfully attempted to calm

1    plaintiff, but he fought with them and was arrested for being drunk in public. [AR 900.]

2    The nurse commented that plaintiff should pursue a "more structured alcohol

3    rehab[ilitation] program" like Veterans Village of San Diego. [AR 901.]

4         On May 9, 2011, plaintiff was admitted to a 28-day inpatient drug and alcohol

5    treatment program. [Doc. No. 11-1, at p. 12.] During the program, plaintiff participated

6    in counseling and in regular group therapy sessions on a number of relevant topics,

7    including stress management, problem solving, relapse prevention, relationships, and

8    life style risk factors. [AR 937-1088.] After completing the third week of the program,

9    he was reportedly "attending groups with good participation." [AR 975.] He was

10   described as social with peers, pleasant, and cooperative with staff. [AR 975.]

11        Plaintiff's pain level reportedly remained high during the inpatient treatment

12   program despite his "scheduled medication regime." [AR 949, 968.] Plaintiff reported

13   that Gabapentin did not relieve his pain, but his pain level was reduced to a four on a

14   scale of ten with Naproxen and Tylenol. [AR 949.] A "TENS unit" was also used

15   during physical therapy to help with pain. [AR 1003.]

16        On June 2, 2011, progress notes indicate plaintiff was accepted into a recovery

17   home upon discharge from the treatment program. [AR 1080.] At this time, a psychiatry

18   resident completed a mental status examination and described plaintiff as calm and

19   cooperative with good eye contact.  His mood was "good" and his thought processes

20   were "linear, logical, [and] goal-directed." [Doc. No. 11-1, at pp. 69-70.] Plaintiff was

21   discharged from the inpatient program on June 7, 2011 and went to Veterans Village

22   for continued treatment. [Doc. No. 11-2, at p. 22; Doc. No. 10-9, at pp. 51-52.]

23        On July 19, 2011, plaintiff had a physical therapy consult that was requested by

24   his primary care physician to restore function, increase strength, and decrease chronic

25   knee pain.  The therapist's notes indicate plaintiff had "decreased knee extension

26   bilaterally," stood on the balls of his feet, and did not put weight on his right heel.  In

27   addition, the therapist's notes state there was "atrophy of bilateral quads and

28   hamstrings." [Doc. No. 10-9, at pp. 68-69; Doc. No. 11-2, at pp. 29-38.] The therapist's

1  treatment plan included stretching, quad and hamstring strengthening, and
2  desensitization of the right heel, but she noted that plaintiff's potential for
3  rehabilitation was only fair. [Doc. No. 10-9, at p. 69.] Plaintiff also had physical
4  therapy on August 2, 2011. [Doc. No. 11-2, at pp. 27-28.]

5       Plaintiff was referred on August 12, 2011 to an anesthesia clinic on an outpatient
6  basis for an evaluation and pain management, because the VA was unable to provide
7  this service to him on a timely basis due to heavy demand.  Outpatient treatment was
8  authorized for a period of six months and could include up to four injections during this
9  period. [Doc. No. 10-9, at pp. 42-48.] The medical records do not clearly indicate
10  whether plaintiff actually went to the outpatient anesthesia clinic for treatment.

11      Plaintiff was interviewed by a social worker from Healthcare for Homeless
12  Veterans on August 25, 2011.  He told the social worker that his goal was to return to
13  college and obtain a Bachelor of Arts and a Master's Degree in social work. [Doc. No.
14  11-2, at pp. 21-22.]

15      On August 30, 2011, plaintiff was referred to an outpatient clinic for assessment
16  and treatment of PTSD. [Doc. No. 11-2, at p. 15.] At this time, plaintiff reported
17  "jumpy behavior and not sleeping," intrusive thoughts, nightmares, depressed mood,
18  hyper-vigilance, exaggerated startle response, social isolation, anger, irritability, and
19  difficulty with concentration. [Doc. No. 11-2, at pp. 14-16.] He was living at Veterans
20  Village and receiving "aftercare" treatment there. [Doc. No. 11-2, at pp. 8-16.] He also
21  said he had experienced pain that was bad enough to limit his usual activities for more
22  than a day. [Doc. No. 11-2, at p. 16.] The psychologist noted that plaintiff was
23  adequately dressed and groomed, cooperative, polite, and oriented as to time, place and
24  person. His intellectual and cognitive functioning were intact. [Doc. No. 1102, at pp.
25  18-19.] As a result of this assessment, plaintiff was to receive individual and group
26  treatment for PTSD. [Doc. No. 11-2, at pp. 19-20.]

27  ///
28  ///

1        Plaintiff received physical therapy to address knee pain on September 21 and 28,

2  2011; and October 4 and 31, 2011. [Doc. No. 11-2, at pp. 3-5, 7-8; 97-99; Doc. No. 11-

3  2, at pp. 139-140.] On October 24, 2011, plaintiff was fitted with replacements for his

4  bilateral patella stabilizing knee braces because his old braces were worn out. [Doc.

5  No. 10-9, at pp. 49-50; Doc. No. 11-2, at p. 103.]

6        On October 24, 2011, plaintiff went to the VA's Electrodiagnostic Laboratory

7  for a "Nerve Conduction and EMG Report." [Doc. No. 11-2, at p. 100.] A detailed

8  report indicates the results of testing were "abnormal." [Doc. No. 11-2, at pp. 101-102.]

9  After the testing, a neurologist completed a lengthy Disability Benefits Questionnaire.

10  It appears the purpose of the Questionnaire was to assist in determining whether

11  plaintiff was entitled to additional disability benefits because of an increase in a

12  service-connected disability. [Doc. No. 11-2, at p. 104.] The Questionnaire is difficult

13  to interpret. However, the Questionnaire does state that plaintiff's "peripheral nerve

14  condition and/or peripheral neuropathy" impact his ability to work. [Doc. No. 11-2, at

15  p. 126.]

16        On October 31, 2011, plaintiff attended session 6 out of 10 of "PTSD 101." The

17  group topics for the session were cognitive distortions and their relationship to PTSD

18  and action planning. [Doc. No. 11-2, at pp. 99-100.] Next, plaintiff had an appointment

19  with a VA psychologist on November 4, 2011 for treatment of PTSD. [Doc. No. 11-2,

20  at p. 97.] He indicated he continued to experience difficulty sleeping and was able to

21  sleep about four interrupted hours per night. Because of his schedule at Veterans

22  Village, plaintiff said he was unable to attend PTSD group therapy at the VA. Plaintiff

23  was assured that he would not be penalized for his obligations at Veterans Village and

24  could retake the course at a later time when his scheduled allowed. [Doc. No. 11-2, at

25  pp. 97, 141.] The psychologist referred plaintiff to Dr. Jin, a VA psychiatrist, for a

26  medication evaluation and PTSD study. [Doc. No. 11-2, at p. 97.]

27        On December 9, 2011, plaintiff had an appointment with Dr. Jin, a VA

28  psychiatrist, for assessment and management of PTSD. He explained to Dr. Jin that he

1    had been in a helicopter crash while he was on active duty and had sleep disturbance

2    and nightmares about the accident after being discharged from the Marine Corps.  He

3    also reported depressed mood, hyper vigilance, exaggerated startle response, social

4    isolation, anger, irritability and difficulty with concentration.  He said he noticed these

5    symptoms on and off.   Plaintiff told Dr. Jin he had been sober for 258 days but

6    previously drank alcohol to make him calm and help him sleep.  At this time, he was

7    sleeping poorly most nights, had nightmares, and felt irritable sometimes. [Doc. No.

8    11-2, at p. 94.] Dr. Jin prescribed Trazodone and continued therapy for PTSD. [Doc.

9    No. 11-2, at p. 94.]

10         On December 28, 2011, plaintiff had another appointment with a VA

11   psychologist for treatment of PTSD. [Doc. No. 11-2, at p. 92.] At this time, he was still

12   living at Veterans Village and was participating in a 12-step recovery program.  He

13   identified multiple stressors in his living environment but indicated he was committed

14   to being successful.  He hoped to return to college.  Because of his schedule at

15   Veterans Village, he was still unable to attend group therapy for PTSD at the VA.

16   However, he was scheduled to begin PTSD therapy known as EMDR through Veterans

17   Village. [Doc. No. 11-2, at p. 92; Doc. No. 11-2, at pp. 96-97.]

18              ***4.    2012 Medical Treatment Records.***

19         Plaintiff was referred on January 30, 2012 to an anesthesia clinic on an

20   outpatient basis for an evaluation and pain management, because the VA was unable

21   to provide this service to him on a timely basis due to heavy demand.   Outpatient

22   treatment was authorized for a period of six months and could include up to four

23   injections during this period. [Doc. No. 10-10, at pp. 45-46.] On March 31, 2012, while

24   plaintiff was living at Veterans Village, he asked for this outpatient consult to be re-

25   authorized because he did not receive his paperwork.  Plaintiff was advised he was

26   eligible to pursue either chiropractic care or anesthesia pain management on an

27   outpatient basis for his low back pain. [Doc. No. 10-10, at p. 48.] The records do not

28   clearly indicate whether plaintiff actually had outpatient chiropractic care or anesthesia

1   pain management during 2012.  In addition, on February 14, 2012, plaintiff was

2   provided with a "TENS unit" and 2 extra sets of electrodes for home management of

3   chronic low back pain. [Doc. No. 10-10, at p. 78.]

4        On February 13, 2012, plaintiff was scheduled to attend orientation for the

5   Homeless Veterans Supported Employment Program (HVSEP). [Doc. No. 10-10, at p.

6   82.] As of April 27, 2012, he also met the "basic criteria for VASH housing." [Doc. No.

7   11-3, at p. 64.]

8        On May 11, 2012, plaintiff had PTSD therapy with his VA psychologist and an

9   appointment with Dr. Jin, his psychiatrist. At this time, plaintiff had been sober for

10  more than a year and reported he was being considered for VASH, which caused him

11  some stress, "as he has come to not expect assistance from government agencies."

12  [Doc. No. 11-3, at p. 58.] He was still receiving PTSD (EMDR) therapy at Veterans

13  Village. [Doc. No. 11-3, at p. 58.] Plaintiff told Dr. Jin he did not think Prozac was

14  helping his mood as he was still feeling low, angry and irritable sometimes.  Dr. Jin

15  increased the dosage.  Trazodone was also not helping him sleep.  He was only

16  sleeping one or two hours per night because of pain and a poor sleeping environment

17  at Veterans Village.  However, he did feel that the PTSD therapy at Veterans Village

18  was helping him. [Doc. No. 11-3, at pp. 58-59.]

19       Plaintiff was "extremely happy and nervous" on May 21, 2012 as he had learned

20  that "his name came up on the HUD/VASH list." [Doc. No. 11-3, at p. 56.] He told his

21  social worker that he was working on his paperwork and wanted to "make certain he

22  is doing everything right." [Doc. No. 11-3, at p. 56.]

23       Meanwhile, in notes from a case management team meeting at Veterans Village

24  on May 24, 2012, plaintiff's case manager expressed concern that he "might not be

25  medication compliant" and could be "'self-sabotaging' his recovery due to his

26  significant anxiety."  [Doc. No. 11-3, at p. 54.]  Potential barriers to his recovery

27  included nightmares, PTSD, and anxiety. [Doc. No. 11-3, at p. 54.]

28  / / /

On May 25, 2012, plaintiff had another routine appointment with a VA psychologist as part of his treatment for PTSD. At this time, he said he had been "sober for more than 1 year" and was "making an effort to make the most of his opportunity to start a new life." [Doc. No. 11-3, at p. 53.] He continued to participate in PTSD therapy at Veterans Village. [Doc. No. 11-3, at p. 53.]

On June 15, 2012, plaintiff brought his social worker a completed application for HUD housing and requested to proceed with the housing process. He told the social worker he had recently been "phased up" at Veterans Village to cashier and bookkeeper. [Doc. No. 11-3, at p. 36.] He had also applied for a job training program for Veterans and was interested in attending the University of California at San Diego as a transfer student. In addition, he was working on obtaining housing, attending AA meetings, yoga, and PTSD therapy to address trauma. [Doc. No. 11-3, at pp. 35-36.]

On June 27, 2012, a health technician mailed plaintiff orthotic foot arches to address his bilateral foot pain. [Doc. No. 11-3, at p. 34.]

In a therapy session on June 29, 2012 for continued treatment of his PTSD, plaintiff told the psychologist he had been asked to move out of Veterans Village by July 21, 2012. [Doc. No. 11-3, at p. 33.] He denied any disciplinary problems or relapse and said he was making progress on obtaining stable housing and employment. However, he was anxious about his housing situation and was concerned that disruption in his housing would impede his ability to make continued progress. [Doc. No. 11-3, at p. 33.]

On July 16, 2012, the VA approved an outpatient chiropractic evaluation of plaintiff's chronic low back pain. Up to twelve chiropractic adjustments were also approved. [Doc. No. 10-10, at pp. 38-42.] The medical records do not clearly indicate whether plaintiff had outpatient chiropractic treatments at this time.

On July 23, 2012, plaintiff told his social worker he was "overwhelmed" and "anxious" about his housing situation because he did not have an apartment and believed he would be asked to exit the Veterans Village by August 4, 2012. [Doc. No.

14cv2361-LAB(KSC)

1   11-3, at pp. 93-95.] On July 26, 2012, plaintiff was seeking an extension of his stay at

2   Veterans Village to give him more time to find an apartment, but his request was not

3   granted. According to the social worker, plaintiff was "very irritable." [Doc. No. 11-3,

4   at pp. 89-92.]

5       On August 3, 2012, after 348 days at Veterans Village, plaintiff was discharged

6   from the aftercare treatment program.   He had successfully completed some

7   components of his program and was referred to transitional housing for homeless

8   persons. [Doc. No. 11-3, at p. 78.] On August 17, 2102, a social worker reported that

9   plaintiff was living at St. Vincent de Paul and was depressed and "tearful" about his

10  move to this transitional housing after being discharged from Veterans Village. He was

11  motivated to search for better housing. [Doc. No. 11-3, at pp. 80-3.]

12      Plaintiff met with his social worker on September 21, 2012 and indicated he had

13  no health concerns at this time other than pain and was interested in being prescribed

14  pain medication.  The social worker noted that plaintiff ambulates with a cane.  He

15  denied any relapse, said he was compliant with his medications, and indicated he was

16  actively looking for housing and employment.  [Doc. No. 11-3, at pp. 75-77.]

17      On November 6, 2012, plaintiff had an unscheduled appointment with a VA

18  psychologist "for treatment of PTSD." [Doc. No 11-3, at p. 127.] Plaintiff was "visibly

19  anxious" about his housing situation. He was homeless and had not been following up

20  with medical visits or his social worker. The psychologist encouraged him to follow

21  through with his social worker about housing and with Dr. Jin for medication. [Doc.

22  No. 11-3, at p. 127.]

23      On November 14, 2012, plaintiff went to the Mission Valley Outpatient Clinic,

24  where he spoke with a social worker.  He reported "low mood in the context of

25  homelessness." [Doc. No. 11-3, at p. 120.] He had not been taking his medications,

26  because he lost them when his housing was terminated at St. Vincent de Paul for

27  fighting with a security guard and drinking alcohol.  Plaintiff believed he had been

28  unfairly targeted by the security guard.  The social worker encouraged plaintiff to

1  follow up with his psychiatrist, Dr. Jin, and his primary care provider.  The social
2  worker reviewed housing resources and indicated she was awaiting confirmation of an
3  extension of plaintiff's housing voucher. [Doc. No. 11-3, at pp. 121-122.]

4      On November 15, 2012, plaintiff went to the VA Emergency Department by bus.
5  He arrived about 6:00 p.m. complaining of despair over his homelessness and inability
6  to obtain housing.  He also indicated he was considering suicide.  He said he had been
7  at Veterans Village for more than 500 days when his per diem ran out so he had to
8  leave.  He then went to St. Vincent de Paul but got into trouble and had to leave, so he
9  had been living on the street for two months and drinking alcohol almost every day.
10  His medications had been destroyed about a month ago, and he was feeling depressed
11  and having flashbacks. [Doc. No. 11-3, at pp. 112-120.]

12      Later on November 15, 2012, while still in the VA Emergency Department,
13  plaintiff was assessed by a social worker, who described him as "looking dejected."
14  The social worker said he was "enjoying telling his stories" and was "inflated in [his]
15  presentation." [Doc. No. 11-3, at p. 110.]  An assessment was completed because
16  plaintiff indicated he had been having "dark thoughts," was in "a bad spot," and might
17  hurt himself or others.  He also said he was hearing voices and having flashbacks
18  related to his time as a Marine. [Doc. No. 11-3, at p. 110.] Plaintiff reported he had not
19  taken his "psych meds" for a month, had been drinking, and had been homeless for a
20  month and a half. [Doc. No. 11-3, at p. 110.]  The examiner described plaintiff's
21  presentation as "dramatic, grandiose, and likely embellished." [Doc. No. 11-3, at p.
22  111.] However, the examiner said plaintiff did "seem to be depressed" and reported
23  "PTSD symptoms." [Doc. No. 11-3, at p. 111.] The examiner concluded as follows:
24  "Likely [patient] is presenting for shelter." [Doc. No. 11-3, at p. 111.] Plaintiff was
25  referred to a crisis house and a suicide hotline. [Doc. No. 11-3, at p. 111.]

26      On November 16, 2012, plaintiff met with a VA psychiatrist, Dr. Zahiri, for a
27  general consult. [Doc. No. 11-4, at pp. 44-49.] Plaintiff indicated he had been homeless
28  for a month and a half after being asked to leave St. Vincent de Paul for fighting with

a security guard. He had also gotten into an altercation earlier in the day with some "Arabic looking men." He claimed the men were mistreating some street women so he felt he needed to defend them. Over the past month, he started drinking again and said he was in a "rough patch." [Doc. No. 11-4, at p. 45.] He had not taken his "psych meds" for a month and a half because they were destroyed by St. Vincent de Paul. [Doc. No. 11-4, at p. 45.] Dr. Zahiri's notes also state as follows: "[H]omelessness addressed with room made available to patient at Halcyon Crisis House. He is grossly oriented toward self preservation. Requested pain meds multiple times during our conversation but did not appear objectively distressed. He reported he has been actively looking for work and remains future oriented toward employment and continued health and mental health care." [Doc. No. 11-4, at p. 48.]

On November 18, 2012, plaintiff was admitted to Halcyon House Crisis Center because of a relapse of his alcohol addiction, "assaultive behavior," and "triggers of his PTSD." [Doc. No. 12-4, at p. 21; Doc. No. 11-4, at p. 15.] The initial assessment notes from November 18, 2012 state plaintiff presented "with anxious mood, blunted affect, [but] logical thought content. . . ." [Doc. No. 12-4, at pp. 24, 35.] He reported PTSD symptoms and said "he has been very depressed recently." [Doc. No. 12-4, at p. 24.] However, the examiner concluded "he does not meet full criteria for a depressive episode." [Doc. No. 12-4, at p. 24.] Plaintiff told the examiner "he began drinking frequently after getting out of the Marine Corps to cope with his feelings of stress and his PTSD symptoms. He built up a tolerance to alcohol and has severe withdrawal symptoms when he tries to quit. He reports that alcohol has made many of his life circumstances and physical problems worse, but he has continued to drink anyway." [Doc. No. 12-4, at p. 29.] According to plaintiff, "[h]is longest time sober was one and a half years while he was living in a structured setting where alcohol was not permitted." [Doc. No. 12-4, at p. 29.]

The examiner indicated plaintiff's intellect was "below average." [Doc. No. 12-4, at p. 30.] In addition, the examiner said plaintiff "shows a consistent long-standing

pattern of exaggerated self importan[ce], self-centered thinking and behavior, and a disregard for the feelings and experiences of others. A rule out of Personality Disorder NOS is indicated." [Doc. No. 12-4, at p. 35.] Additional diagnostic impressions included "narcissistic traits." [Doc. No. 12-4, at p. 37.]

On November 19, 2012, a social worker visited plaintiff at Halcyon House and reported that his "thought and speech process" were "coherent." [Doc. No. 11-4, at p. 19.] Plaintiff reported that he was homeless and starting drinking alcohol again after being asked to leave St. Vincent de Paul. He was having "10/10 pain while living on the streets . . . which was a trigger for him to drink heavily." [Doc. No. 11-4, at pp. 19-20.]  He also said "everything lost its importance when I left [Veterans Village]." [Doc. No. 11-4, at p. 20.] Plaintiff expressed strong motivation "to become sober again." [Doc. No. 11-4, at p. 20.] The social worker also noted that plaintiff had been asked to leave Veterans Village as of August 4, 2012 because he completed his treatment and had been "'written up' on several occasions for not following program rules." [Doc. No. 11-4, at p. 21.]

On November 20, 2012, plaintiff spoke with a social worker by telephone "as a means of recovery support." [Doc. 11-4, at p. 18.] Plaintiff "was insightful and had a cooperative attitude." [Doc. No. 11-4, at p. 18.] They discussed plaintiff's "concern with housing" and maintaining sobriety. [Doc. No. 11-4, at p.18.]

On November 21, 2012, plaintiff met with an addiction therapist at Halcyon House, and the progress notes state plaintiff "was insightful and had a cooperative attitude." [Doc. No. 11-4, at p. 17.] Plaintiff expressed concern about housing and his "need to be off the streets," and the therapist indicated she would remain available to assist plaintiff in obtaining a home placement. [Doc. No. 11-4, at p. 17.]

On November 23, 2012, a social worker evaluated plaintiff at Halcyon House, and he denied abusing drugs or alcohol since he was admitted. [Doc. No. 11-4, at pp. 15-16.] Her observations were that plaintiff was alert, his thought process was coherent, and his intellectual functioning and fund of knowledge appeared average.

His mood and affect were pleasant. He was adequately groomed and dressed, and he maintained good eye contact. [Doc. No. 11-4, at p. 15.] When plaintiff indicated he would not have shelter on his scheduled date of discharge, November 27, 2012, the social worker referred plaintiff to several potential sources for housing and encouraged him to start contacting landlords for availability. [Doc. No. 11-4, at p. 16.]

Plaintiff was discharged from Halcyon House on November 27, 2012 and the following notation was made on his final paperwork: "states he is recently having psychotic symptoms despite no [history] of these. However, this is in the context of his desire for an extension at this center. Client will not be extended due to his lack of acuity at this time." [Doc. No. 12-4, at p. 40.]

Shortly thereafter, on November 30, 2012, plaintiff reported to an addiction therapist at the VA Clinic that he quit drinking and was living at Alpha Project. [Doc. No. 11-4, at p. 5.] The progress notes indicate plaintiff was calm, stable, and cooperative, and his cognition was adequate. He had a positive attitude and was motivated to get back on track with his recovery and to locate housing. [Doc. No. 11-4, at pp. 8-9.] He planned to move to the winter shelter at Veterans Village and was working with a "VASH social worker" to get into an apartment. [Doc. No. 10-10, at pp. 15-20.]

On December 3, 2012, plaintiff had an appointment with a VA health technician who gave him knee brace supports to address "abnormality of gait." [Doc. No. 11-4, at p. 3.] Plaintiff was also measured and fitted with an aluminum cane to replace his wooden cane for the purpose of addressing "[a]bnormality of [g]ait." [Doc. No. 10-10, at p. 13.]

On December 17, 2012, plaintiff told his social worker that he was in "survival mode." [Doc. No. 11-4, at p. 58.] He was "irritable and defensive" and said Alpha Project destroyed his medications, so he was trying to get an appointment with his psychiatrist, Dr. Jin. Plaintiff was homeless again after being asked to leave Alpha Project "due to an altercation with another resident." [Doc. No. 11-4, at p. 58.] Alpha

1   Project staff also reported that he had been drinking. He appeared irritable, defensive,
2   and somewhat delusional. He denied recent drinking behavior even though the Alpha
3   Project staff said he returned to the shelter intoxicated. [Doc. No. 11-4, at p. 58.] The
4   social worker recommended an inpatient program and/or recovery home placement.
5   [Doc. No. 11-4, at p. 59.]

6          A psychiatry outpatient note dated December 19, 2012 states that plaintiff "was
7   recommended for inpatient [treatment for alcohol dependence] because of his inability
8   to maintain abstinence in a less restrictive level of care." [Doc. No. 11-4, at p. 52.]
9   Plaintiff agreed to be admitted for treatment on December 20, 2012 with a discharge
10  date of January 10, 2013, at least 75 days in a recovery home, and participation in after
11  care groups for at least six to nine months. [Doc. No. 11-4, at p. 52.]

12         A physical therapy consult dated December 24, 2012 indicates plaintiff was
13  receiving hydro therapy to address chronic back pain. [Doc. No. 10-10, at pp. 6-9.]

14              **5.    _2013 Medical Treatment Records_.**

15         Progress notes from the inpatient treatment program indicate plaintiff had good
16  participation and was committed to the program. [Doc. No. 10-8, at pp. 79-80.] "He
17  attended lectures and meetings and gained insight into relapse triggers and developed
18  strategies to avoid relapse. During weekends, he participated in sober activities. . . .
19  He attended classes in communication and relapse prevention. He worked to develop
20  a sober support network on passes. He was not a behavioral problem during this
21  hospitalization and completed the full program. . . ." [Doc. No. 10-8, at p. 80.]

22         During the program, plaintiff indicated that self-medicating his chronic pain had
23  been his trigger to relapse. Treatment notes state that plaintiff said he began drinking
24  heavily after his helicopter crash at age 31 in order to help manage his pain. He
25  reportedly used a cane and "bilateral knee braces" and complained of knee, heel, and
26  back pain during the program. The examiner's notes say plaintiff had a "normal gait"
27  and did not appear to be in distress. Acetaminophen, Naproxen, and hydrotherapy were
28  prescribed to manage pain during the in-patient treatment program. [Doc. No. 11-4, at

pp. 73-99; Doc. No. 11-5, at pp. 1-135; Doc. No. 10-8, at pp. 67, 72-73, 76, 77, 80.]
Prior to admission, plaintiff had been taking Gabapentin and Dilantin but said they
made him feel like "a zombie." The treatment notes also state plaintiff had previously
been taking Vicodin and Percocet for pain. Although there had been some concern
about narcotics abuse, plaintiff adamantly denied having a problem with opiates.
Discharge medications included 500 mg of Naproxen or Naprosyn for pain twice per
day. [Doc. No. 11-5, at pp. 101, 107; Doc. No. 10-8, at p. 77.]

At the time of his discharge from the inpatient treatment program, plaintiff's
mood was "good," but he reported he was depressed at times, which he described as
feeling self-hatred, hopelessness, and worthlessness. [Doc. No. 10-8, at p. 68.] He was
calm, cooperative, logical, and goal-directed but "nervous." [Doc. No. 10-3, p. 79.]
Further evaluation was recommended, because plaintiff appeared "to have limited
insight and [was] not very forthcoming." [Doc. No. 10-8, at p. 75.]

After his discharge on January 10, 2013 from the VA inpatient residential
program, plaintiff moved into the Way Back Sober Living facility where he was
attending support group meetings and receiving "recovery support" through an
outreach program. He began searching for permanent housing. [Doc. No. 11-5, at pp.
86-92.]

On January 17, 2013, a health technician instructed plaintiff on the use of an
"orthotic/prosthetic device" called a "bilateral patella stabilizer." [Doc. No. 11-5, at p.
93.]

On February 20, 2013, plaintiff met with an addiction therapist. Although he
reported "no alcohol use," plaintiff was depressed, homeless, and awaiting a home
placement. He told the therapist he had been involved in an altercation the night before
with another homeless Veteran and had to defend himself. Plaintiff stated, "I asked
him to leave me alone but he wouldn't. . . . When I left, the person was not getting up."
[Doc. No. 11-6, at pp. 4-6.] Later in the day, plaintiff went to the Emergency
Department complaining of pain, depression, low energy, and a number of other

symptoms including hopelessness, racing thoughts, panic attacks, nightmares, and flashbacks. He was wearing knee braces and carried a cane. [Doc. No. 11-6, at pp. 16-28.] Although he had previously been on anti-depressant medication, he had not been taking it for awhile. [Doc. No. 11-6, at pp. 6-9.]

As of August 7, 2013, a social worker's notes indicate plaintiff was hospitalized for an unidentified reason. The social worker was seeking admission for plaintiff in a Recuperative Care Program upon discharge from the hospital. [Doc. No. 10-10, at pp. 99-103.]

As of April 25, 2013, plaintiff was living at Renaissance House run by Volunteers of America after 30 days of sobriety. On plaintiff's behalf, a social worker requested information to determine whether he qualified to participate in group therapy for substance abuse and mental illness (SAMI). However, it was unclear from the available records whether plaintiff qualified for this therapy. Although plaintiff met the criteria for substance abuse, it was unclear whether he had also been diagnosed with PTSD. In addition, the social worker had to resolve transportation issues for plaintiff to be able to make it to the therapy session. [Doc. No. 10-10, at pp. 105-107.]

A letter to the ALJ from the Clinical Director of Veterans Village indicates that plaintiff was a "current resident" there as of October 1, 2013 following treatment for alcohol abuse. While at Veterans Village, plaintiff continued to show symptoms of depression, anxiety, and PTSD. [Doc. No. 10-7, at pp. 220-221.] He also continued to complain of pain in his low back and knees as a VA "consult request" dated November 4, 2013 indicates plaintiff was to receive acupuncture treatments on an outpatient basis to address this pain. [Doc. No. 10-10, at p. 88.]

On November 5, 2013, plaintiff had an appointment with Dr. Jin. He reported that his mood is still low. He also feels angry and irritable from time to time. Since he moved back to Veterans Village, he sleeps two to three hours per night. He indicated he had not been compliant with his medications since his last visit and wanted to try a medication other than Prozac because it did not work well for him in

1   the past.  As a result, Dr. Zin prescribed Zoloft instead of Prozac; continued plaintiff's
2   prescription for Trazodone; and talked to plaintiff about the importance of being
3   compliant with his medications. [Doc. No. 12-4, at p. 85.]

4          On November 8, 2013, plaintiff went to the walk-in clinic at Veterans Village
5   to speak with a social worker, who noted he was "anxious," which is "his baseline."
6   [Doc. No. 12-4, at p. 81.] He was focused on getting housing and vocational assistance
7   after leaving Veterans Village.  The social worker told plaintiff he did not need to focus
8   on these issues until he completed the substance rehabilitation portion of his program
9   "in about 100 days." [Doc. No. 12-4, at p. 82.] She encouraged plaintiff to focus on
10  participating in this current program and not to spend so much time focusing on outside
11  distractions.  In her opinion, focusing on outside distractions "would be detrimental to
12  his attempt at continued sobriety." [Doc. No. 12-4, at pp. 81-82.] Instead, she told him
13  that he needed to focus on "grasping the concepts of sobriety" at VVSD and "prove by
14  his actions and words that he is fully participating in what is asked of him." [Doc. No.
15  12-4, at p. 82.]

16         On December 9, 2013, bone density testing was performed to evaluate whether
17  plaintiff had developed osteoporosis, because prior spine x-rays showed osteopenia.
18  [Doc. No. 12-4, at p. 42.] The results state as follows: "Multiple compression
19  deformities of the lumbar spine artificially over exaggerates the calculated bone
20  mineral density. . . .  Osteopenia.  Multiple compression deformities of the L1 through
21  L5 and are unchanged compared to the prior examination." [Doc. No. 12-4, at p. 43.]

22             6.    *2014 Medical Treatment Records.*

23         In 2014, the record indicates that plaintiff continued to reside at Veterans
24  Village, where he participated in a rehabilitation program and was receiving medical
25  and aftercare treatment for alcohol dependence issues, anxiety, depression, PTSD, and
26  chronic pain. [Doc. No. 10-7, at pp. 220-221; Doc. No. 10-2, at pp. 47-49, 51-54; Doc.
27  No. 12-4, at pp. 18, 20.] As noted above, the VA approved a "consult request" for
28  plaintiff to receive acupuncture treatments for pain on an outpatient basis as of

November 4, 2013. [Doc. No. 10-10, at p. 88.] In addition, on January 15, 2014, he was given free access to a "TENS unit" on an "as needed" basis for pain treatment. [AR 1919.] However, the record does not include any treatment records from Veterans Village.

Plaintiff had an appointment with Dr. Jin on February 7, 2014. The treatment notes state as follows: "Reports his mood is still not great though his ang[er] and irritability seem to improve after Zoloft dose increased. Reports he sleeps 2-3 hours with current Trazodone. Feels his body pain still bothers him a lot and it also disrupts his sleep. He is not on pain medications since he believes that the VVSD where he is living doesn't allow any strong pain medications. He still enjoys therapy at VVSD and has been sober from alcohol over 140 days so far. . . ." [Doc. No. 12-4, at p. 58.]

### C.    *Other Relevant Medical Records and Opinions*.

The record includes a number of written assessments or opinions by various medical professionals and quasi-medical professionals. Each of these assessments is summarized below in chronological order according to the date prepared.

### 1.    *K. Loomis, M.D. (November 18, 2010)*.

Dr. Loomis, a psychiatrist, prepared a Case Analysis on November 18, 2010. In the Case Analysis, Dr. Loomis concluded based on the records he reviewed that plaintiff had the residual functional capacity for light work with seizure precautions. [Doc. No. 10-7, at pp. 120-123.] Dr. Loomis also completed a Mental Residual Functional Capacity Assessment on November 18, 2010 [Doc. No. 10-7, at pp. 111-113], which concludes as follows:   "The claimant is capable of understanding, remembering and carrying out simple one to two step tasks. The claimant is able to maintain concentration, persistence and pace throughout a normal workday/work week as related to simple tasks. The claimant is able to interact adequately with coworkers and supervisors but may have difficulty dealing with the demands of general public contact.   The claimant is able to make adjustments and avoid hazards in the workspace." [Doc. No. 10-7, at p. 113.]

### 2.   *M. Ormsby, M.D. (November 18, 2010).*

Dr. Ormsby, a medical consultant, completed a Physical Residual Functional Capacity Assessment on November 18, 2010. [Doc. No. 10-7, at pp. 114-119.] On the form, Dr. Ormsby checked boxes indicating plaintiff could lift 20 pounds occasionally and 10 pounds frequently and could stand about 6 hours in an 8-hour workday with an assistive device necessary for ambulation.  Due to chronic left foot and heel pain, Dr. Ormsby concluded plaintiff's ability to push and/or pull with his lower extremities was limited.  Dr. Ormsby also concluded plaintiff could climb stairs, stoop, kneel, crouch, and crawl occasionally.  With the use of a cane, Dr. Ormsby further concluded plaintiff could occasionally walk on uneven terrain. Dr. Ormsby indicated the file he reviewed to complete the assessment did not include a statement by a treating or examining source about plaintiff's physical capacities. [Doc. No. 10-7, at pp. 114-119.]

### 3.   *G. Rivera-Miya, M.D. (May 3, 2011).*

Dr. Rivera-Miya completed a Case Analysis form on May 3, 2011. [Doc. No. 10-7, at pp. 210-211.]  Although this Case Analysis is difficult to decipher, it appears that Dr. Rivera-Maya concluded there was insufficient evidence of "ongoing marked psych limitations." [Doc. No. 10-7, at p. 211.]

### 4.   *S. Laiken, M.D., Medical Consultant (June 2, 2011).*

On June 2, 2011, Dr. Laiken completed a Physical Residual Functional Capacity Assessment form.  On page 1 of the form, Dr. Laiken stated plaintiff's primary diagnosis was a history of seizures. [Doc. No. 10-7, at p. 212.] Based on the records reviewed, Dr. Laiken concluded plaintiff had not established exertional, postural, manipulative, visual, or communicative limitations.  However, Dr. Laiken checked a box indicating plaintiff should avoid concentrated exposure to heights because of his seizure history. [Doc. No. 10-7, at pp. 212-216.]

///

///

///

### 5. *Dr. Hua Jin, Staff Psychiatrist, VA Healthcare System (January 2014)*.

In January 2014, plaintiff's treating physician, Dr. Jin, Staff Psychiatrist, VA Healthcare System, submitted two letters while plaintiff's drug and alcohol addiction were in remission and he was in the rehabilitation program at Veterans Village. The content of Dr. Jin's letters are discussed more fully below in the section of this Report and Recommendation discussing the sufficiency of the evidence to support the ALJ's decision.

### 6. *Director of Veterans Village or VVSD (February 2014)*.

On February 1, 2014, the Clinical Director of Veterans Village, who is a licensed marriage and family therapist, wrote a letter in support of plaintiff's disability claim. [Doc. No. 10-7, at pp. 220-221.] At the time the letter was written, plaintiff was a current resident of Veterans Village and had been there since October 1, 2013. [Doc. No. 10-7, at p. 220.] The letter explains that plaintiff had been a previous resident of Veterans Village from June 7, 2011 through August 3, 2012. [Doc. No. 10-7, at p. 220.]

Based on a "thorough assessment," the Clinical Director's opinion was that plaintiff met the criteria for a diagnosis of PTSD, major depressive disorder, and generalized anxiety disorder. According to the Clinical Director's letter, plaintiff had previously been prescribed Elavil and Prozac to treat depression and anxiety. He was "currently prescribed Zoloft as an attempt to treat continued indications of depression and anxiety." [Doc. No. 10-7, at p. 221.]

The Clinical Director cited the following reasons for her conclusion that plaintiff suffered from generalized anxiety disorder in the controlled environment of Veterans Village: "He excessively worries about events that are out [of] his control, he does not seem to have the ability to control these worries and he has demonstrated evidence of being easily fatigued throughout the day at VVSD. Additionally, he has established a pattern of irritability and his anxiety has caused significant distress in his social and occupational functioning." [Doc. No. 10-7, at p. 221.] It was also the Clinical

Director's opinion that plaintiff met the criteria for anxiety in Listing 12.06, because of "his continuous hyper-awareness of his surrounding[s] to the extent it negatively impacts his cognitive functioning to properly maintain productive employment. He has persistent irrational fears which compel him to avoid behavior that would be productive. . . ." [Doc. No. 10-7, at p. 221.]

For the following reasons, the Clinical Director also believed plaintiff met the criteria for a diagnosis of PTSD: "He directly experienced a traumatic event that threatened his life. He has recurrent involuntary and intrusive memories of the event which has triggered feelings of agony and anxiety. He makes unsuccessful efforts to avoid the memories and recollections of his CH-46 helicopter uncontrollably descending from the air and ultimately colliding with the ground. His clear feelings of detachment or estrangement from others have prevented him from effectively maintaining employment. His trauma has resulted in him engaging in reckless or self-destructive behavior." [Doc. No. 10-7, at p. 220.] It was also the Clinical Director's opinion that plaintiff's injuries from the crash "lead him to start self-medicating with alcohol in order to deal with the chronic pain related to his injuries" and his PTSD symptoms. [Doc. No. 10-7, at pp. 220-221.]

### 7.   *Mitchell Lehman, Licensed Acupuncturist, and Master of Traditional Oriental Medicine (March 14, 2014).*

On March 14, 2014, Mr. Lehman wrote a lengthy letter discussing plaintiff's "medical problems and disability." [Doc. No. 12-4, at p. 87.] The letter states that Mr. Lehman has known plaintiff for two years during his current and prior stays at Veterans Village. [Doc. No. 12-4, at p. 87.] Mr. Lehman volunteers his services at Veterans Village and has been providing acupuncture treatments to plaintiff to address pain. [Doc. No. 12-4, at p. 88.] He indicated plaintiff is "not consistent with being treated with acupuncture." [Doc. No. 12-4, at p. 90.] "There are spurts when he is consistent and he reports relief. However, the relief is fleeting." [Doc. No. 12-4, at p. 90.]

1    It is Mr. Lehman's opinion that plaintiff is not employable because of his

2  physical injuries and pain.  According to Mr. Lehman, plaintiff cannot walk without

3  the assistance of a cane; can only walk short distances of about 15 minutes before

4  he must rest from fatigue or pain; reports shooting pain from his heel into his spine;

5  cannot carry objects over 20 pounds for fear of losing his balance as he must use a

6  cane and carry with only one arm; and cannot crouch to lift because he only has one

7  good foot for balance. [Doc. No. 12-4, at pp. 88-89.] In addition, Mr. Lehman

8  reports that "both knees are 'bone on bone' meaning that there is no cartilage to

9  ease the movement of the joint" so each step "causes enormous amounts of

10  pain. . . ." [Doc. No. 12-4, at p. 88.] In addition, Mr. Lehman states that plaintiff

11  does not socialize well with others; "is brusque at best;" and isolates himself as

12  much as possible from other residents at Veterans Village. [Doc. No. 12-4, at pp.

13  89-90.]

14        **8.   _Lee Bowlus, VA Staff Psychiatrist (March 21, 2014)._**

15    On March 21, 2014, Lee Bowlus, M.D., a VA staff psychiatrist, completed a

16  Compensation and Pension Examination.  Dr. Bowlus met with plaintiff in-person

17  to complete the examination and also reviewed plaintiff's claim file, VA medical

18  records, and records from Veterans Village, where plaintiff was residing at the time

19  of the examination. [Doc. No. 12-4, at pp. 91, 94.] Plaintiff told Dr. Bowlus that he

20  had tried to work but "is in a lot of pain and has muscle cramps." [Doc. No. 12-4, at

21  p. 95.]

22    Based on his examination, Dr. Bowlus concluded plaintiff's claimed

23  depression "was at least as likely as not (50% or greater probability) incurred in or

24  caused by the claimed in-service injury, event or illness." [Doc. No. 12-4, at p. 92.]

25  Dr. Bowlus cited the following rationale for his conclusion: "[A]fter his helicopter

26  crash he was treated at NMC SD and noted to be depress[ed].  Since then he [has]

27  had on-going treatment for depression . . . and currently." [Doc. No. 12-4, at pp. 92,

28  95.] The remainder of the opinion by Dr. Bowlus is discussed more fully below in

1  the section of this Report and Recommendation discussing the sufficiency of the

2  evidence to support the ALJ's decision.

3            **9.**     ***Peter D. Wayson, PhD, Psychologist (March 31, 2014).***

4         On March 31, 2014, Dr. Wayson, a licensed psychologist, prepared an

5  assessment and evaluation of plaintiff at the request of a legal assistant who was

6  helping plaintiff with his claim for disability benefits. To prepare his assessment,

7  Dr. Wayson met with plaintiff as a volunteer on February 24, 2014 and March 28,

8  2014.  [Doc. No. 12-4, at p. 97.] According to Dr. Wayson, plaintiff had a "restless

9  irritable manner," showed "significant paranoia," and had "rather grandiose and

10  unrealistic ideas of what lies ahead for him." [Doc. No. 12-4, at p. 98.] Dr. Wayson

11  said plaintiff seemed to be "a confused and anxious individual who has trouble

12  concentrating and staying on topic and who reacts to many stimuli with anger and

13  irritation.  He made numerous contradictory statements throughout both interviews.

14  He reports that he is currently being prescribed Zoloft for depression and Trazodone

15  for sleep.  By and large he finds these medications helpful." [Doc. No. 12-4, at p.

16  28.]

17         Dr. Wayson also concluded plaintiff is a "highly anxious individual who is

18  suffering from a kind of chronic PTSD array of symptoms" and who "is depressed

19  by his own admission." [Doc. No. 12-4, at p. 98.] Dr. Wayson believed plaintiff was

20  "only functioning as well as he is" because of the structure at Veterans Village and

21  "without it, he would soon lose his way again." [Doc. No. 12-4, at 98-99.] Finally,

22  Dr. Wayson concluded plaintiff was not capable of any significant employment at

23  the time he was examined, because he had trouble maintaining basic social

24  functioning and had difficulties with concentration. [Doc. No. 12-4, at pp. 99.]

25  / / /

26  / / /

27  / / /

28  / / /

III. ***Testimony at the April 10, 2014 Hearing Before the ALJ.***

    A. ***Plaintiff.***

At the hearing, plaintiff testified that he was 49 years old, had a high school diploma and some college. [Doc. No. 10-2, at p. 45.] He listed May 1, 1995 as the date he became disabled, because he was involved in a helicopter crash in 1995. When he was discharged by the Marine Corps, he was in a wheelchair, but he worked his way out of it. [Doc. No. 10-2, at pp. 56-57.]

Plaintiff testified that he was in the Marine Corps for more than ten years, and during that time, he had meritorious promotions and some awards. [Doc. No. 10-2, at pp. 61-62.] Plaintiff confirmed that he had no formal work history for the past 20 years. [Doc. No. 10-2, at p. 45.] However, he explained that after he was discharged from the Marine Corps in 1995 he had an electric cart provided to him by the Department of Veterans Affairs. He used the cart to function as a ranch hand from May 1995 to August 2010. He could get around with the cart so he could "ride the fences," feed horses, take care of livestock, and wash cars. [Doc. No. 10-2, at pp. 45, 57-58.] However, in August 2010, the owner of the ranch lost the property as a result of a foreclosure. [Doc. No. 10-2, at p. 58.] In 2006, plaintiff worked for a sanitation company helping with the payroll and doing office work. [Doc. No. 10-2, at p. 58.] In July of 2011, plaintiff attempted to do some studio art work as a condition of living in a building for homeless people. [Doc. No. 10-2, at pp. 58-59.]

At the time of the hearing, plaintiff was receiving his medical treatment through the Veterans Administration Healthcare System ("VA") and the Veterans Village of San Diego ("Veterans Village" or "VVSD"). [Doc. No. 10-2, at p. 46.] He also had an independent evaluation by Dr. Wayson. [Doc. No. 10-2, at p. 46.] At the time of the hearing, plaintiff said he was taking the following medications as prescribed by his treating physicians: (1) Trazodone at night for sleep; and (2) Zoloft or Sertraline. [Doc. No. 10-2, at p. 47.] He did not believe the medications were helping him very much, because he had pain at 3:00 a.m. or 4:00

1   a.m. and did not sleep for long. [Doc. No. 10-2, at pp. 47-48.] However, he testified

2   he was living at Veterans Village and in order to participate in the program there he

3   was unable to take pain medication. [Doc. No. 10-2, at pp. 47, 50.] Instead, he was

4   meditating and using breathing techniques to control his pain that starts with cramps

5   in his feet and radiates up through his back. [Doc. No. 10-2, at p. 48.] In addition,

6   plaintiff said he was being treated by an acupuncturist for pain twice a week, and

7   the treatments were "extremely effective." [Doc. No. 10-2, at pp. 48-51.]

8       Plaintiff also testified he had not had any alcohol since September 2013 and

9   had been attending Alcoholics Anonymous and other similar programs twice a day.

10  [Doc. No. 10-2, at p. 47.]  In addition, plaintiff said he was doing well in the

11  Veteran's Village program, had taken on a leadership role, and was trying to enroll

12  in college. [Doc. No. 10-2, at p. 49.] However, he claimed to have continuing and

13  persistent symptoms of PTSD.  He testified he was receiving cognitive behavioral

14  therapy to learn techniques to treat these symptoms. [Doc. No. 10-2, at pp. 51-54.]

15      ***B.***    ***Medical Expert:  Alfred Jonas, M.D.***

16          ***1.***      ***Physical Limitations.***

17      According to his Curriculum Vitae, Dr. Jonas is a psychiatrist. [Doc. No. 10-

18  4, at pp. 81-85.]  He offered only brief testimony about physical limitations.  Dr.

19  Jonas testified that the record is "very unclear" as to any physical limitations.  [Doc.

20  No. 10-2, at p. 60.]  He confirmed that plaintiff was using a cane on the day of the

21  hearing.  Dr. Jonas also said there was "some mention of a wheelchair" in the

22  record.  However, he was unable to determine whether plaintiff had any "exertional

23  limitations." [Doc. No. 10-2, at p. 60.]

24          ***2.***      ***Mental Health Issues.***

25      The majority of the testimony by Dr. Jonas focused on mental health issues.

26  Dr. Jonas said his review of the record revealed references to a "fairly broad range"

27  of psychiatric diagnoses. [Doc. No. 10-2, at p. 60.] He therefore considered whether

28  there was enough evidence in plaintiff's medical records from the VA Healthcare

1  System to conclude his condition met one of the following mental health Listings as

2  set forth in the "Listing of Impairments" in the Social Security regulations:

3                           *a.*     ***Listing 12.04, Affective Disorders (i.e., Depression).***

4        Dr. Jonas noted that plaintiff was receiving "some treatment" for depression

5  since the record showed he was prescribed Zoloft or Sertraline.   However, it was

6  the opinion of Dr. Jonas that the record did not include "really strong indicators" of

7  a "consistent pattern of symptoms of depression."   [Doc. No. 10-2, at p. 60.]

8                           *b.*     ***Listing 12.06, Anxiety Related Disorders (i.e., PTSD).***

9        Dr. Jonas noted there were many references in the record to PTSD and panic

10  disorder, which Dr. Jonas said "is most likely related to the helicopter incident."

11  [Doc. No. 10-2, at pp. 60-62.] However, Dr. Jonas found that the symptoms of

12  PTSD were not clear over the course of the record. [Doc. No. 10-2, at p. 62.] As a

13  result, it was his opinion that the diagnosis of PTSD is "not clearly confirmed" by

14  the record. [Doc. No. 10-2, at p. 62.] Dr. Jonas also noted no one had attempted to

15  treat plaintiff for PTSD even though the diagnosis was repeatedly referenced in his

16  records.[8] [Doc. No. 10-2, at p. 72.] It appeared to be his view that PTSD is over

17  reported and that is why the term appeared repeatedly in plaintiff's medical records.

18  [Doc. No. 10-2, at pp. 72-74.]

19                           *c.*     ***Listing 12.08, Personality Disorders.***

20        Dr. Jonas said there are "notes of anti-social personality traits" in plaintiff's

21  medical records that "are all suggestive of some kind of personality disorder." [Doc.

22  No. 10-2, at p. 62.] However, none of these notations "gives us a clear

23  conclusion . . . that they're sure that there is a personality disorder and that it's a

24  certain type." [Doc. No. 10-2, at p. 63.] Therefore, Dr. Jonas said he had "serious

25  questions" and "doubts" as to whether plaintiff has any personality disorder.   He

26

27      [8]    As summarized above, there are numerous references in the treatment

28  notes indicating plaintiff was being treated for PTSD by the VA and Veterans Village,
so this testimony by Dr. Jonas is inaccurate and raises concerns as to the thoroughness
of his review of plaintiff's medical records.

14cv2361-LAB(KSC)

explained his opinion as follows: "[O]ne of the things that makes it unclear is the ten years he was a Marine where the claimant functioned very well and even got a number of promotions. If somebody has a considerable personality disorder, you're not going to see that pattern of behavior and accomplishment." [Doc. No. 10-2, at p. 63.]

### d. *Listing 12.09, Substance Addiction.*

Dr. Jonas testified that "there are many references throughout the record" to substance abuse by plaintiff, including abuse of "Vicodin, which is a narcotic analgesic medication," alcohol, and amphetamines.[9] [Doc. No. 10-2, at p. 63.] The record indicates plaintiff's substance abuse began "after his helicopter accident in 1995." [Doc. No. 10-2, at p. 64.] There is nothing to indicate he had any substance abuse issues prior to the helicopter accident. Based on the record, Dr. Jonas found there was "very good reason" to confirm a diagnosis of substance abuse. [Doc. No. 10-2, at p. 64.]

On the other hand, the record indicates plaintiff's substance abuse ended in October 2013. According to Dr. Jonas, there is nothing that contradicts this evidence, and there is evidence indicating his adjustment has been "very good." [Doc. No. 10-2, at pp. 63-64.] Thus, Dr. Jonas said he "would confirm [Listing] 12.09 with complete confidence." [Doc. No. 10-2, at pp. 65, 67.]

### 3. *Malingering.*[10]

Based on unidentified "contradictory statements" made by plaintiff and treatment notes from October 2010 and November 2012, Dr. Jonas concluded there is evidence of "malingering" in the record. Although he testified "malingering" is not a diagnosis, Dr. Jonas said "it does affect our understanding of the record."

[9] It is uncertain why Dr. Jonas referred to amphetamine abuse. The record does not clearly support this testimony.

[10] "Malingering" is "the act of intentionally feigning or exaggerating physical or psychological symptoms for motives involving personal or financial gain." 2 The Gale Encyclopedia of Mental Health 923 (3d ed. 2012).

[Doc. No. 10-2, at p. 64.]  According to Dr. Jonas, this type of behavior "distorts our ability to make assumptions about [plaintiff's] presentation in general, and his assertions about his level of [symptoms] and/or functional impairment." [Doc. No. 10-2, at pp. 64-65.] The referenced medical treatment record from October 2010 includes a long list of brief, unexplained notations, such as "r/o PSTD" and "r/o panic disorder." [Doc. No. 10-7, at p. 15.] As Dr. Jonas testified, one of these notations states "r/o malingering," which he read to mean "rule out malingering." [Doc. No. 10-2, at p. 64; Doc. No. 10-7, at p. 15.] With respect to the medical treatment note from November 2012, Dr. Jonas testified he believed this was evidence of malingering, since the note indicated plaintiff's "presentation was embellished for the purpose of gaining shelter because he was homeless at that time."[11] [Doc. No. 10-2, at p. 64.]

### 4.  *Level of Impairment.*

In the opinion of Dr. Jonas, most, "if not all," of plaintiff's impairment in social functioning is related to addiction.  "In terms of maintenance of appropriate social functioning" while abusing substances, Dr. Jonas said plaintiff was "at least markedly impaired if not worse." [Doc. No. 10-2, at p. 65.] As a result, Dr. Jonas concluded plaintiff "meets a listing" under Section 12.09 when he is abusing drugs or alcohol.  [Doc. No. 10-2, at p. 67.]  However, in times when he is not abusing drugs or alcohol, his social impairment would, at best, be mild to moderate and

---

[11]    In November 2012, a social worker who assessed plaintiff in the Emergency Department described him as "looking dejected," but said he was "enjoying telling his stories" and was "inflated in [his] presentation." [Doc. No. 11-3, at p. 110.] A mental health assessment was completed because he indicated he had been having "dark thoughts," was in "a bad spot," and might hurt himself or others.  He also said he was hearing voices and having flashbacks related to his time as a Marine. [Doc. No. 11-3, at p. 110.] Plaintiff reported he had not taken his "psych meds" for a month, had been drinking, and had been homeless for a month and a half. [Doc. No. 11-3, at p. 110.] The examiner described plaintiff's presentation as "dramatic, grandiose, and likely embellished." [Doc. No. 11-3, at p. 111.] However, the examiner said plaintiff did "seem to be depressed" and reported "PTSD symptoms." [Doc. No. 11-3, at p. 111.] The examiner concluded as follows: "Likely [patient] is presenting for shelter." [Doc. No. 11-3, at p. 111.] Plaintiff was referred to a crisis house and a suicide hotline. [Doc. No. 11-3, at p. 111.]

1   would therefore not "meet or equal" a Listing. [Doc. No. 10-2, at pp. 67-68.] As

2   support for this position, Dr. Jonas refers to the ten years when plaintiff was

3   "functioning in the Marines" and doing well while presumably not abusing

4   substances, and the period of time since October 2013, when plaintiff indicates he

5   stopped abusing substances and is reportedly functioning as "a model resident" at

6   the Veterans Village.  However, Dr. Jonas qualified his analysis by stating that he

7   was relying on plaintiff's testimony about his performance as a Marine, his work on

8   the ranch, and his positive progress at Veterans Village.[12] [Doc. No. 10-2, at p. 66.]

9       With respect to concentration, persistence, and pace, Dr. Jonas said there was

10  no evidence pointing to an impairment. [Doc. No. 10-2, at p. 67.] As an example,

11  Dr. Jonas cited plaintiff's time spent as a ranch hand from 1995 until 2010 when it

12  appears plaintiff demonstrated "adaptive functioning." [Doc. No. 10-2, at p. 67.]

13      Based on his observations during the hearing, Dr. Jonas concluded plaintiff's

14  presentation was "not an example of perfect interpersonal functioning." [Doc. No.

15  10-2, at p. 66.] As a result, it was his opinion that plaintiff "would probably want to

16  avoid settings that depend on excellent interpersonal functions" with co-workers or

17  supervisors. [Doc. No. 10-2, at pp. 66-67.]  However, Dr. Jonas believed plaintiff

18  would not have a problem functioning in more "casual" settings where interpersonal

19  interaction is "relatively infrequent."  [Doc. No. 10-2, at p. 68.]

20      In sum, Dr. Jonas had no reason to believe plaintiff could not function

21  adequately "given an appropriate kind of job, which would be one that would not be

22  heavy on social load." [Doc. No. 10-2, at p. 69.] In reaching his conclusion,

23  Dr. Jonas assumed the truth of certain assertions made by plaintiff that he

24  functioned well in the Marines for ten years, worked consistently on a ranch for

25  about 15 years, and had been doing well at Veterans Village since October 2013,

26  when he stopped abusing drugs and alcohol. [Doc. No. 10-2, at p. 69.]

27

28      [12]    "I realize I'm basing most of this, most of all of this on his report in the
hearing today, but it's all I have." [Doc. No. 10-2, at p. 69.]

1  ### C. *Vocational Expert.*

2  Nelly Katsell, a vocational expert [Doc. No. 10-4, at p. 87], responded to two

3  hypothetical questions posed by the ALJ.  First, she testified there would be full-

4  time jobs available locally and nationally for a younger individual with a high

5  school education and some college, who had performed medium unskilled work

6  within the past 15 years, but was limited to sedentary work with only minimal or

7  casual contact with co-workers, supervisors, and the public. [Doc. No. 10-2, at p.

8  75.] However, if this hypothetical person was 50 years old, he would be considered

9  disabled. [Doc. No. 10-2, at p. 77.] At the time of the hearing, plaintiff was a few

10  months away from his 50th birthday. [Doc. No. 10-5, at p. 4; Doc. No. 10-2, at p.

11  44.]

12  Second, considering the pain and limitations outlined in a letter by Michael

13  Lehman, a licensed acupuncturist [Doc. No. 12-4, at pp. 87-90 (Exhibit 63)],[13] the

14  vocational expert testified that no work would be available to a person who:

15  (1) cannot stand or walk without assistance of a cane or wheelchair; (2) can only

16  walk short distances for about 15 minutes before resting because of fatigue and

17  pain; (3) cannot carry objects over 20 pounds for more than five minutes; and

18  (4) has difficulty lifting objects above the waist. [Doc. No. 10-2, at p. 76.]

19  ///

20  ### IV. *Sufficiency of the Evidence.*

21

22  [13]  As noted above, Mr. Lehman explained in a letter dated March 14, 2014 (Exhibit 63) that he volunteers his licensed acupuncture services to homeless and

23  disabled veterans.  Mr. Lehman stated in his letter that plaintiff is unable to stand straight up because of the injury to his heel, and this "taxes every joint from his feet to

24  ankles, knees, hips, back, shoulders and neck." [Doc. No. 12-4, at p. 88.] According to Mr. Lehman, plaintiff can no longer walk without the assistance of a cane and can only

25  walk short distances of about 15 minutes and must then rest from fatigue and pain.  In addition, plaintiff reports "a shooting pain originating from his heel and going right

26  into his spine." [Doc. No. 12-4, at p. 88.] Because he uses a cane with one hand, he can only carry items with the other hand, and he would not be able to carry objects over 20

27  pounds as it might cause him to lose his balance.  He also risks losing his balance if he lifts objects above his waist.  Mr. Lehman also stated in his letter that plaintiff has

28  problems with his knees and difficulty crouching to lift because "he has only one good foot to balance on." [Doc. No. 12-4, at p. 88.] According to Mr. Lehman, plaintiff "must wear specially designed orthotics in his shoes." [Doc. No. 12-4, at p. 88.]

1    The final decision of the Commissioner must be affirmed if it is supported by

2  substantial evidence and if the Commissioner has applied the correct legal

3  standards.  *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193

4  (9th Cir. 2004).  Under the substantial evidence standard, the Commissioner's

5  findings are upheld if supported by inferences reasonably drawn from the record.

6  *Id.*  If there is evidence in the record to support more than one rational

7  interpretation, the District Court must defer to the Commissioner's decision.  *Id.*

8  Substantial evidence means "such relevant evidence as a reasonable mind might

9  accept as adequate to support a conclusion."  *Osenbrock v. Apfel*, 240 F.3d 1157,

10  1162 (9th Cir. 2001).   The Court must weigh both the evidence that supports and

11  detracts from the administrative ruling.  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th

12  Cir. 1999).

13    **A.    *The ALJ's Five-Step Disability Analysis*.**

14    To qualify for disability benefits under the SSA, an applicant must show that

15  he or she is unable to engage in any substantial gainful activity because of a

16  medically determinable physical or mental impairment that has lasted or can be

17  expected to last at least 12 months.  42 U.S.C. § 423(d).  The Social Security

18  regulations establish a five-step sequential evaluation for determining whether an

19  applicant is disabled under this standard.  20 CFR § 404.1520(a); *Batson v. Comm'r*

20  *of the Social Security Admin.*, 359 F.3d at 1193-1194.

21    When, as in this case, there is evidence of substance addiction, and the

22  claimant is disabled based on the five-step analysis, the ALJ must then complete a

23  "materiality analysis."  *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001).  A

24  "materiality analysis" is completed to determine whether the applicant's drug or

25  alcohol addiction is a "contributing factor material to the determination of

26  disability."  *Id.*  "If a claimant's current physical or mental limitations would remain

27  once he stopped using drugs and alcohol, and these remaining limitations are

28  / / /

- 46 -

1  disabling, then drug addiction or alcoholism is not material to the disability, and the

2  claimant will be deemed disabled." *Id.*

3       At step one, the ALJ must determine whether the applicant is engaged in

4  substantial gainful activity. 20 CFR § 404.1520(a)(4)(I). Here, the ALJ concluded

5  plaintiff has not engaged in "substantial gainful activity" since he filed his

6  application for benefits. [Doc. No. 10-2, at p. 19.]

7       At step two, the ALJ must determine whether the applicant is suffering from a

8  "severe" impairment within the meaning of Social Security regulations. 20 CFR

9  § 404.1520(a)(4)(ii). "An impairment or combination of impairments is not severe

10 if it does not significantly limit [the applicant's] physical or mental ability to do

11 basic work activities." 20 CFR § 404.1521(a). For example, a slight abnormality

12 or combination of slight abnormalities that only have a minimal effect on the

13 applicant's ability to perform basic work activities will not be considered a "severe"

14 impairment. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). Examples of

15 basic work activities include walking, standing, sitting, lifting, pushing, pulling,

16 reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out

17 and remembering simple instructions, use of judgment, responding appropriately to

18 supervision, co-workers and usual work situations, and dealing with changes in a

19 routine work setting. 20 CFR § 404.1521(b)(1)-(6). "If the ALJ finds that the

20 claimant lacks a medically severe impairment, the ALJ must find the claimant not to

21 be disabled." *Webb v. Barnhart*, 433 F.3d at 686.

22      Here, at step two, the ALJ concluded that plaintiff has the following severe

23 impairments: drug and alcohol abuse; PTSD; personality disorder; depression; knee

24 arthralgia;[14] lumbar spine compression fracture;[15] history of heel injury; history of

25

26      [14]    "Arthralgia: pain in one or more joints." Merriam-Webster Medical
27 Dictionary, http://www.merriam-webster.com/medlineplus/arthralgia.

28      [15]    "The lumbar spine refers to the lower back, where the spine curves inward
toward the abdomen. It starts about five or six inches below the shoulder blades, and
connects with the thoracic spine at the top and extends downward to the sacral spine."

1    seizures; and osteopenia.[16] The ALJ also found that these impairments "cause more

2    than minimal functional limitations." [Doc. No. 10-2, at p. 19.]

3        If there is a severe impairment, the ALJ must then determine at step three

4    whether it meets or equals one of the "Listing of Impairments" in the Social Security

5    regulations. 20 CFR § 404.1520(a)(4)(iii).  If the applicant's impairment meets or

6    equals a Listing, he or she must be found disabled.  *Id.*

7        With respect to mental disorders, there are ***four*** Listings at issue in this case:

8    Listing 12.04, Affective Disorders (*e.g.*, depression); Listing 12.06, Anxiety Related

9    Disorders (*e.g.*, PTSD); Listing 12.08, Personality Disorders; and Listing 12.09,

10   Substance Addiction.[17]  Generally, a mental disorder meets or equals the required

11   level of severity in these Listings if the claimant has one or more of the symptoms

12   listed in paragraph A of the Listing, and those symptoms result in "marked"

13   restriction of the claimant's activities of daily living, social functioning,

14   concentration, persistence, or pace under Paragraph B and/or C of the Listing.  20

15   CFR Pt. 404, Subpt P, App. 1.

16       In this case, the ALJ concluded at step three that plaintiff's impairments met

17   Listings 12.06, Anxiety Related Disorders, 12.08, Personality Disorders, and 12.09,

18   Substance Addiction, in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

19   § 416.920(d)). [Doc. No. 10-2, at p. 19.]  The ALJ explained that plaintiff's mental

20

21   Spine-health, http://www.spine-health.com/conditions/
spine-anatomy/lumbar-spine-anatomy-and-pain. "Compression fracture: fracture (as
of vertebra caused by compression of one bone against another." Merriam-Webster

22   Medical Dictionary, http://www.merriam-webster.com/medlineplus/
compression%20fracture.

23

24   [16]    "Osteopenia: reduction in bone volume to below normal levels especially
due to in adequate replacement of bone lost to normal lysis." Merriam-Webster

25   Medical Dictionary, http://www.merriam-webster.com/medlineplus/osteopenia.

26   [17]    Listing 12.09 defines "Substance Addiction Behavior" as follows:
"Behavioral changes or physical changes associated with the regular use of substances

27   that affect the central nervous system." 20 CFR Pt. 404, Subpt. P. App. 1. The level
of severity of this disorder is evaluated under other Listings, including Listings 12.04,

28   12.06, and 12.08.  20 CFR Pt. 404, Subpt. P. App. 1.  In addition, as outlined more
fully below, evidence of substance addiction requires the ALJ to complete a
"materiality" analysis.

     14cv2361-LAB(KSC)

impairments satisfied the paragraph A criteria of these Listings, because he "has recurrent and intrusive recollections of a traumatic experience that are a source of marked distress, deeply ingrained maladaptive patterns of behavior associated with persistent disturbance of mood or affect and behavioral changes associated with regular use of substances that affect the central nervous system." [Doc. No. 10-2, at p. 20.]

Plaintiff's mental impairments also satisfied the paragraph B criteria of Listings 12.06, 12.08, and 12.09, because he had at least "two marked" limitations or one "marked" limitation and "repeated" episodes of decompensation. [Doc. No. 10-2, at p. 20.] Plaintiff had "marked" limitations in his activities of daily living as evidenced by periods of alcohol abuse, homelessness, and the inability to maintain shelter placements. [Doc. No. 10-2, at p. 20.] In addition, plaintiff had marked difficulties in social functioning as he behaved socially inappropriately, exhibited dishonesty, drug seeking behaviors, malingered for shelter, and was manipulative. There was also evidence of four or more episodes of decompensation as plaintiff "had frequent hospitalizations" and "increased mood and anxiety symptoms." [Doc. No. 10-2, at p. 20.] The ALJ further found plaintiff was "credible" as to "the following symptoms and limitations: that he had disabling anxiety, mood and personality symptoms when he used drugs and/or alcohol preventing him from being able to interact with others, tend to his daily living, and focus on and complete tasks." [Doc. No. 10-2, at p. 20.]

The ALJ's step three analysis does not discuss whether plaintiff is impaired under Listing 12.04, Affective Disorders, as a result of depression, even though he concluded at step two that plaintiff's depression qualifies as "severe." [Doc. No. 10-2, at p. 19.] As summarized above, plaintiff's medical records are replete with references to depression, even in times when his substance abuse is in remission. The ALJ's analysis also does not discuss whether plaintiff's "severe" physical impairments and/or pain from these physical impairments meet any of the Listings.

1        Although he concluded that plaintiff's mental impairments met the severity

2   requirements in Listings 12.06, 12.08, and 12.09, the ALJ did not make a disability

3   finding as required by SSA regulations.  SSA regulations state in pertinent part as

4   follows: "If you have an impairment(s) which meets the duration requirement and is

5   listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled

6   without considering your age, education, and work experience."  20 C.F.R.

7   § 404.1520(d).  Instead of finding at step three that plaintiff was disabled, the ALJ

8   proceeded directly to the "materiality analysis" and concluded that plaintiff's severe

9   impairments were not disabling when he stopped drug and alcohol abuse. [Doc. No.

10   10-2, at pp. 21-30.]  Unless and until there is a finding of disability, an ALJ should

11   not proceed with a "materiality analysis" to determine whether the applicant's drug

12   or alcohol addiction is a "contributing factor material to the determination of

13   disability." *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001).  As mentioned in

14   defendant's briefing, this and other flaws are harmless if they do not affect the

15   outcome.  *Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2007).  Defendant contends

16   that any flaws in the ALJ's disability analysis are harmless, because substantial

17   evidence supports the ALJ's materiality determination.

18        If an impairment does not meet or equal a Listing, the ALJ must make a step

19   four determination of the claimant's residual functional capacity based on all

20   impairments, including impairments that are not severe. 20 CFR § 404.1520(e), §

21   404.1545(a)(2).  "Residual functional capacity" is "the most [an applicant] can still

22   do despite [his or her] limitations." 20 CFR § 404.1545(a)(1). The ALJ must

23   determine whether the applicant retains the residual functional capacity to perform

24   his or her past relevant work. 20 CFR § 404.1520(a)(4)(iv). If the applicant cannot

25   perform past relevant work, the ALJ–at step five–must consider whether the

26   applicant can perform any other work that exists in the national economy.  20 CFR

27   § 404.1520(a)(4)(v).  While the applicant carries the burden of proving eligibility at

28   steps one through four, the burden at step five rests on the agency. *Celaya v.*

1   *Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).  Here, as noted above, the ALJ did not

2   complete his analysis at step three of the five-step disability analysis.  He also

3   skipped steps four and five of the disability analysis.  Instead, he proceeded directly

4   to the five-step materiality analysis.

5          **B.    *Materiality Analysis re:  Severity of Impairments.*

6          A "materiality" determination is made by evaluating which of the claimant's

7   "current physical and mental limitations" that were used to make the "current

8   disability determination[] would remain if [the claimant] stopped using drugs or

9   alcohol and then determine whether any or all of your remaining limitations would

10  be disabling."  20 CFR § 404.1535(b)(2).  "[T]he claimant bears the burden of

11  proving that his alcoholism or drug addiction is not a contributing factor material to

12  his disability determination."  *Id.*

13         Although the claimant bears the burden of proving that addiction is not a

14  contributing factor material to a disability determination, SSA regulations also state

15  as follows: "We will make every reasonable effort to obtain all relevant and

16  available medical evidence about your mental impairment(s), including its history,

17  and any records of mental status examinations, psychological testing, and

18  hospitalizations and treatment."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Listing 12.00,

19  Mental Disorders, also explains how mental disorders are evaluated.  This Listing

20  acknowledges that "[p]articular problems are often involved in evaluating mental

21  impairments in individuals who have long histories of repeated hospitalizations or

22  prolonged outpatient care with supportive therapy and medication. . . .  It is,

23  therefore, vital that we review all pertinent information relative to your condition,

24  especially at times of increased stress.  We will attempt to obtain adequate

25  descriptive information from all sources that have treated you in a time period

26  relevant to the determination or decision."  20 CFR Pt. 404, Subpt. P, App. 1,

27  Listing 12.00(E).

28  */ / /*

1    Here, the ALJ's materiality analysis is based on an incomplete record. From

2  October 1, 2013 through April 10, 2014, the date of the hearing before the ALJ,

3  plaintiff was living at Veterans Village and participating in a rehabilitation program

4  there. [Doc. No. 10-2, at p. 42; Doc. No. 10-7, at p. 220.] During the hearing on

5  April 10, 2014, he testified that he was receiving treatment from Veterans Village

6  and his treatment there was "coordinated with the VA." [Doc. No. 10-2, at p. 46.]

7  However, the Court was unable to locate treatment records from Veterans Village

8  during this time period.  Since this time period represented a lengthy period of

9  sobriety for plaintiff, any treatment records from Veterans Village would have been

10  highly relevant to the ALJ's material analysis.  Instead, the ALJ relied heavily on

11  general statements plaintiff made during his testimony indicating he was doing very

12  well at Veterans Village.  However, his testimony is not a suitable replacement for

13  highly relevant medical treatment records.

14    Preliminarily, the ALJ's materiality analysis states as follows: "Even in the

15  absence of drug and/or alcohol use, the claimant's posttraumatic stress disorder,

16  personality disorder, depression, knee arthralgia, lumbar spine compression fracture

17  and osteopenia continue causing more than minimal functional limitations and

18  remain severe." [Doc. No. 10-2, at p. 21.] In other words, plaintiff's physical and

19  mental limitations satisfy the severity requirements at step two of the five-step

20  materiality analysis even when he stops his drug and/or alcohol abuse.

21    At step three of the materiality analysis, the ALJ concluded that when

22  plaintiff was not abusing drugs or alcohol his severe mental impairments would not

23  meet Listing 12.06, Anxiety Related Disorders,[18] or Listing 12.08, Personality

24

25    [18]    Listing 12.06 defines "Anxiety Related Disorders" as follows: "In these
26  disorders anxiety is either the predominant disturbance or it is experienced if the
   individual attempts to master symptoms; for example, confronting the dreaded object
   or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive
27  compulsive disorders." 20 CFR Pt. 404, Subpt. P. App. 1. Signs or symptoms include
28  motor tension, autonomic hyperactivity, apprehensive expectation, vigilance and
   scanning, persistent irrational fear, recurrent severe panic attacks, and recurrent and
   intrusive recollections of a traumatic experience.  20 CFR Pt. 404, Subpt. P. App. 1.

1   Disorders.[19]  [Doc. No. 10-2, at pp. 21-22.] As with the ALJ's disability analysis,

2   the ALJ's materiality analysis does not consider whether plaintiff's "severe

3   impairment" of depression meets Listing 12.04, Affective Disorders, even though

4   plaintiff's medical records, as summarized above, are replete with references to

5   depression and symptoms of depression, even in times when his alcohol dependence

6   is in remission. The ALJ's failure to consider whether plaintiff's severe depression

7   met Listing 12.04 when he was not abusing drugs or alcohol may have been

8   prejudicial in this case.

9        Listing 12.04 defines "Affective Disorders" as "a disturbance of mood,

10  accompanied by a full or partial manic or depressive syndrome. Mood refers to a

11  prolonged emotion that colors the whole psychic life; it generally involves

12  depression or elation." 20 CFR Pt. 404, Subpt. P. App. 1.  The severity

13  requirements in Paragraph A of Listing 12.04 are satisfied by "[m]edically

14  documented persistence, either continuous or intermittent" of "[d]epressive

15  syndrome" characterized by at least four of the following symptoms: anhedonia or

16  pervasive loss of interest in almost all activities; sleep disturbance; agitation;

17  decreased energy; feelings of guilt or worthlessness; difficulty concentrating or

18  thinking; thoughts of suicide; or paranoid thinking.  20 CFR Pt. 404, Subpt. P, App.

19  1, Listing 12.04(A).

20       As summarized above, the available medical records include a number of

21  references to depression and symptoms of depression even when plaintiff's

22  substance abuse is in remission.  For example, plaintiff's treating physician, Dr. Jin,

23  stated in a letter that plaintiff had been diagnosed with PTSD and depression and

---

[19]     According to Listing 12.08: "A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness." 20 CFR Pt. 404, Subpt. P. App. 1. Symptoms include deeply ingrained, maladaptive behavior; seclusiveness; inappropriate hostility; persistent disturbances of mood; pathological dependence, passivity, or aggressivity; intense and unstable interpersonal relationships; and/or impulsive and damaging behavior.    20 CFR Pt. 404, Subpt. P. App. 1.

indicated plaintiff was still being treated for these conditions during a significant
remission of his alcohol dependence while at Veterans Village. Dr. Jin also stated
he had recently increased the dosages of plaintiff's prescriptions for Zoloft and
Trazodone "to further target his symptoms." [Doc. No. 12-4, at pp. 18, 20.]
Although he indicated plaintiff's "overall situation" had improved after a lot of
treatment, he continued to exhibit "unstable mood, anger and irritability [from] time
to time. . . ." [Doc. No. 12-4, at p. 20.] As indicated above in the summary of
plaintiff's medical records, there are a number of treatment notes supporting the
statements in Dr. Jin's letters. [*See, e.g.*, Doc. No. 10-2, at pp. 47-49, 51-54; Doc.
No. 10-7, at pp. 220-221; Doc. No. 10-8, at p. 68; Doc. No. 12-4, at pp. 18, 20, 58,
81-82, 85.] In addition, the Clinical Director of Veterans Village stated that plaintiff
continued to show symptoms of depression, anxiety, and PTSD while at Veterans
Village. [Doc. No. 10-7, at pp. 220-221.] Plaintiff also testified at the hearing that
he did not believe his medications were helping him very much because he did not
sleep for long and had pain at 3:00 a.m. or 4:00 a.m. [Doc. No. 10-2, at pp. 47-48.]

To satisfy the severity requirements in Paragraph B of Listing 12.04, the
claimant's symptoms must result in "marked" restriction of at least two of the
following: activities of daily living; maintaining social functioning; or maintaining
concentration, persistence, or pace. 20 CFR Pt. 404, Subpart P, App. 1, Listing
12.04. "Marked" means "more than moderate but less than extreme." 20 CFR Pt.
404, Subpart P, App. 1, Listing 12.00(C). Alternatively, Paragraph B of Listing
12.04 may be satisfied based on evidence of "[r]epeated episodes of
decompensation, each of extended duration." 20 CFR Pt. 404, Subpart P, App. 1,
Listing 12.04(B).

With reference to Listings 12.06, Anxiety Related Disorders, and 12.08,
Personality Disorders, the ALJ concluded that plaintiff only had mild restrictions in
his activities of daily living when he was not abusing alcohol, because he was able
to maintain adequate living arrangements and attend meetings and group therapy

1 | while he was sober.  In this regard, the ALJ also cites plaintiff's testimony that he
2 | "even took on a leadership role to other residents" at Veterans Village. [Doc. No.
3 | 10-2, at p. 22.] It was also the ALJ's opinion that plaintiff only had moderate
4 | difficulties in social functioning when he was sober, because he was able to interact
5 | with others in group therapy "without apparent difficulty." [Doc. No. 10-2, at p. 22.]
6 | Next, the ALJ concluded plaintiff had only mild difficulties in concentration,
7 | persistence or pace, because "progress notes show intact cognitive functioning when
8 | the claimant was sober (Exhibit 29F/17-18)." [Doc. No. 10-2, at p. 22.] Finally,
9 | without drug or alcohol abuse, it was the ALJ's opinion that plaintiff would not
10 | have any episodes of decompensation as there would be no need for "extensive
11 | hospitalizations or crisis intervention services," and, as a result, the Paragraph B
12 | criteria of the relevant Listings would not be met. [Doc. No. 10-2, at p. 22.]

13 |      Even if the ALJ's conclusions in this regard are supported by substantial
14 | evidence and could support similar findings under Listing 12.04, Affective
15 | Disorders, the ALJ's analysis would be incomplete under this Listing.
16 | Alternatively, with respect to Listing 12.04, a claimant may satisfy the severity
17 | requirements if they have one or more of the symptoms listed in paragraph A and
18 | also meet the requirements in paragraph C.  Paragraph C of Listing 12.04, Affective
19 | Disorders, is satisfied when there is:

20 | Medically documented history of chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of
21 | ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the
22 | following:

23 | 1.    Repeated episodes of decompensation, each of extended duration; or . . .
24 |
25 | 3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
26 |
27 | 20 CFR Pt. 404, Subpt. P, App. 1.
28 | / / /

In this regard, introductory Listing 12.00, Mental Disorders, explains as follows:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure. Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on you. With lowered mental demands, overt symptoms and signs of the underlying mental disorder may be minimized. At the same time, however, your ability to function outside of such a structured or supportive setting may not have changed. If your symptomatology is controlled or attenuated by psychosocial factors, we must consider your ability to function outside of such highly structured settings.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Here, the record as a whole strongly supports a conclusion that plaintiff is unable to function outside highly structured settings. In this regard, there is significant evidence in the record indicating that plaintiff's anxiety, depression, and chronic pain, which appear to be related, get the better of him every time he leaves a structured setting, resulting in a relapse of his alcohol dependence and homelessness. Then, he repeatedly returns to the structured setting of treatment and rehabilitation, where his symptoms improve, but not enough to lead to a higher, more independent level of functioning with a job and permanent housing. In sum, the ALJ's analyses of the issues of disability and materiality should have considered whether plaintiff's "severe depression" met the requirements in Listing 12.04, and his failure to do so may have been prejudicial to plaintiff. If the requirements of Listing 12.04 were met while plaintiff's alcohol dependence was in remission, the ALJ would have been required to find plaintiff was entitled to disability benefits.

## C.   *Materiality Analysis re: Residual Functional Capacity.*

If, as the ALJ determined, plaintiff's combined impairments did not meet or equal a Listing when he stopped using alcohol, the ALJ was required to proceed to step four and five of the materiality analysis. Steps four and five of the materiality analysis required the ALJ to consider all of plaintiff's medically determinable impairments, including any pain that could "cause a limitation of function" and any

14cv2361-LAB(KSC)

impairments that were not "severe," and then determine plaintiff's residual
functional capacity to perform any past relevant work or to perform other work in
the national economy.  20 CFR §§ 404.1520; 404.1545; 416.929.  "In determining
[the claimant's] residual functional capacity, the ALJ must consider whether the
aggregate of [the claimant's] mental and physical impairments may so incapacitate
him that he is unable to perform available work." *Light v. Soc. Sec. Admin.*, 119
F.3d 789, 793 (9th Cir. 1997), as amended on reh'g (Sept. 17, 1997).  As noted
above, "residual functional capacity" is "the most [an applicant] can still do despite
[his or her] limitations." 20 CFR § 404.1545(a)(1).  All limitations must be
considered, even those not considered severe.  20 CFR §§ 404.1520(e);
404.1545(a)(2).

In this case, the ALJ concluded plaintiff had the residual functional capacity
to perform light work if he was not abusing drugs or alcohol.  According to the ALJ,
plaintiff would be able to perform light work in a job with minimal interaction with
co-workers, supervisors, and the public. [Doc. No. 10-2, at p. 22.] To reach this
conclusion, the ALJ rejected plaintiff's contention that all of his impairments
combined (*i.e.*, anxiety; PTSD; hyper-vigilance; depression; sleep disturbance;
personality problems; joint, heel, low back, and knee pain) severely limited his
ability to complete work-related tasks and activities. [Doc. No. 10-2, at p. 23.] In
this regard, the ALJ concluded that plaintiff's statements about the "intensity,
persistence, and limiting effects" of his impairments were not credible. [Doc. No.
10-2, at p. 23.]

Based on plaintiff's age, education, work experience and residual functional
capacity, the ALJ also decided that plaintiff could perform "a significant number of
jobs [available] in the national economy."  [Doc. No. 10-2, at p. 29.] As a result, the
ALJ concluded plaintiff's alcohol and/or drug abuse was a contributing factor to the
determination of disability, so plaintiff "has not been disabled within the meaning of
the Social Security Act at any time from the date the application was filed" through

- 57 -

1    May 19, 2014, the date of the ALJ's decision.  [Doc. No. 10-2, at pp. 29-30.]

2    However, as outlined more fully below, the ALJ's determination in this regard is not

3    supported by substantial evidence in the record.

4           *1.*   ***Physicians' Opinion.***

5          Plaintiff argues that the ALJ's decision to deny benefits based on his residual

6    functional capacity assessment is not supported by substantial evidence, because he

7    gave too much weight to the opinion of the testifying psychiatrist, Dr. Jonas, and

8    gave too little weight to the opinion of his treating psychiatrist, Dr. Jin.  Plaintiff

9    believes Dr. Jin's opinion is well-supported and consistent with other substantial

10   evidence in the record, and as a result, it was entitled to controlling weight.

11         With respect to evidence obtained from physicians, the Ninth Circuit makes

12   distinctions "among the opinions of three types of physicians: (1) those who treat

13   the claimant (treating physicians); (2) those who examine but do not treat the

14   claimant (examining physicians); and (3) those who neither examine nor treat the

15   claimant (nonexamining physicians)." *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir.

16   1995).

17         "As a general rule, more weight should be given to the opinion of a treating

18   source than to the opinion of doctors who do not treat the claimant. [Citation

19   omitted.] At least where the treating doctor's opinion is not contradicted by another

20   doctor, it may be rejected only for 'clear and convincing' reasons. [Citation

21   omitted.] We have also held that 'clear and convincing' reasons are required to

22   reject the treating doctor's ultimate conclusions. [Citation omitted.] Even if the

23   treating doctor's opinion is contradicted by another doctor, the Commissioner may

24   not reject this opinion without providing 'specific and legitimate reasons' supported

25   by substantial evidence in the record for so doing. [Citation omitted.]" *Id.* When

26   there is conflicting medical evidence in the record, the ALJ must resolve the conflict

27   by determining issues of credibility. *Chaudhry v. Astrue,* 688 F.3d 661, 671 (9th Cir.

28   2012). "The ALJ need not accept the opinion of any physician, including a treating

physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009).

Factors to be considered in evaluating the opinion of a treating physician include the length of the treatment relationship; the frequency of examination; the nature and extent of the treatment relationship; the extent to which the opinion is supported by relevant evidence and consistent with the record as a whole; and whether the treating physician is a specialist in a particular disability at issue. 20 CFR § 404.1527(c).

### a.   *Dr. Jonas, Psychiatrist, Testifying Expert.*

The ALJ afforded the opinions of the testifying expert, Dr. Jonas, with "substantial weight" and either rejected or discounted the opinions of all other treating and examining physicians and quasi-medical witnesses. [Doc. No. 10-2, at pp. 26-28.] The testimony of Dr. Jonas was given "substantial weight," because he is familiar with Social Security rules and regulations and specializes in psychiatry. In addition, the ALJ said the opinions of Dr. Jonas were supported by medical records indicating plaintiff's symptoms and activities of daily living improved when he was not abusing alcohol or drugs. [Doc. No. 10-2, at p. 26.]

The ALJ gave the testimony of Dr. Jonas "substantial weight" even though it was very weak in certain respects. First, as to plaintiff's physical limitations, Dr. Jonas testified the record is "very unclear" as to any physical limitations, and he was unable to determine whether plaintiff had any "exertional limitations." [Doc. No. 10-2, at p. 60.] An ALJ's duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2010). Despite his heavy reliance on the testimony of Dr. Jonas, who essentially testified the record was ambiguous on this issue, the ALJ concluded plaintiff retained the exertional capacity for light work tasks. [Doc. No. 10-2, at p. 24.]

1    Second, Dr. Jonas testified that no one had attempted to treat plaintiff for

2   PTSD even though the diagnosis was repeatedly referenced in his records. [Doc.

3   No. 10-2, at p. 27.] This testimony is simply inaccurate and is unsupported by

4   plaintiff's medical records.  There are a number of treatment notes and other

5   evidence showing that plaintiff had been screened for PTSD, received treatment for

6   PTSD from the VA and at Veterans Village, and was still receiving treatment for

7   PTSD at the time of his hearing before the ALJ. [Doc. No. 10-2, at pp. 47-49, 51-54;

8   Doc. No. 10-7, at pp. 140-141, 220-221; Doc. No. 11-2, at pp. 8-20, 92, 94, 96-100,

9   141; Doc. No. 11-3, at p. 33, 58-59, 127; Doc. No. 12-4, at pp. 18, 20.]

10    Third, Dr. Jonas concluded there was evidence of "malingering" in the record

11   and indicated this affected his understanding of the record. [Doc. No. 10-2, at p. 64.]

12   However, as outlined more fully above, the cited evidence of "malingering" was

13   very weak – an unexplained "r/o malingering" notation in a list and a brief comment

14   in a social worker's notes from November 2012 that plaintiff appears to be "inflated

15   in [his] presentation" and likely "presenting for shelter." [Doc. No. 10-2, at p. 64;

16   Doc. No. 11-3, at p. 111.] This does not constitute clear evidence of malingering,

17   and none of plaintiff's treating or examining doctors concluded that plaintiff was

18   malingering.  As a result, this evidence is not enough to undermine plaintiff's

19   credibility and should not have affected the analysis or conclusions of Dr. Jonas.

20   *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

21          ***b.   Dr. Jin, VA Psychiatrist, Treating Physician.***

22    In support of plaintiff's disability application, Dr. Jin submitted two letters

23   addressing plaintiff's condition while his alcohol addiction was in remission and he

24   was in the rehabilitation program at Veterans Village.  Dr. Jin's initial letter of

25   January 10, 2014 states that plaintiff had been diagnosed with PTSD and

26   depression.  The letter also lists a number of factors related to plaintiff's mental

27   condition, beginning with his "broken back" and "chopped off right heel surgically

28   repaired" after a helicopter crash in 1995. [Doc. No. 12-4, at p. 18 (Exhibit 58F).]

1    Dr. Jin's second letter of January 31, 2014 states in part as follows:

2           This letter is to verify that [plaintiff] has been a patient of mine
     during [the] past 3 years in our Post Traumatic Stress Disorder Clinic
3    Team (PCT) at San Diego VA Healthcare system. [Plaintiff] has been
     diagnosed as having post traumatic stress disorder and alcohol
4    dependence in remission based on his history and clinic presentation.
     He is currently taking Zoloft 100 mg once a day and trazodone 100 mg
5    at bedtime to help his symptoms. Due to the chronicity of his PTSD,
     he still presents unstable mood, anger and irritability [from] time to
6    time though his overall situation has improved [after] a lot of treatment.
     Some of these symptoms may interfere with his ability to work and
7    daily activities. . . .

8    [Doc. No. 12-4, at p. 20 (Exhibit No. 60F).] In addition, as noted above, a

9    handwritten note by Dr. Jin at the bottom of this letter confirms that as of

10   February 7, 2014, he increased the dosages of plaintiff's prescriptions for Zoloft and

11   Trazodone to be taken at bed time to further target his symptoms. [Doc. No. 12-4, at

12   p. 20.]

13          The ALJ afforded Dr. Jin's opinion "little weight" because plaintiff "is very

14   active socially at [Veterans Village], has taken on a leadership role to other

15   residents, plans to complete his college degree, is able to focus on his meetings and

16   residential tasks and maintain his placement, has improved symptoms, intact

17   cognition and has not required extensive hospitalizations." [Doc. No. 10-2, at p. 28.]

18   In addition, the ALJ afford Dr. Jin's opinion "little weight" because plaintiff had

19   "relatively good maintained activities of daily living." [Doc. No. 10-2, at p. 28.]

20          In this Court's view, the ALJ's reasons for rejecting Dr. Jin's opinions do not

21   qualify as specific and legitimate reasons based on substantial evidence. The ALJ's

22   reasons for rejecting Dr. Jin's opinions about plaintiff's mental health appear to be

23   based solely on a small portion of plaintiff's testimony at the hearing, and the ALJ's

24   decision overstates the significance of this testimony in light of the record as a

25   whole, which supports Dr. Jin's opinions. There is no testimony that could fairly be

26   interpreted to mean that plaintiff is "very active socially" at Veterans Village. [Doc.

27   No. 10-2, at p. 28.] Plaintiff testified that he attended meetings twice a day, such as

28   Alcoholics Anonymous. Attending group therapy meetings, which were likely

- 61 -

1   required as part of his rehabilitation program, is not the type or quality of evidence

2   that could establish plaintiff was "very active socially" at Veterans Village. [Doc.

3   No. 10-2, at p. 28.]

4        Plaintiff's testimony does indicate he believed he was doing well in his

5   rehabilitation program at Veterans Village.  When asked if he needed to complete or

6   be involved in a program at Veterans Village, he said he had "recently been phased

7   up" and this was "damn good." [Doc. No. 10-2, at pp. 48-49.] When asked what his

8   obligations would be as a result of "recently" being "phased up," plaintiff replied:

9   "Leadership throughout the compound.  I'm also becoming . . . a model resident at

10  VBSD." [Doc. No. 10-2, at p. 49.] He also testified he planned to attend college.

11  However, plaintiff's testimony was too general and the claimed progress was too

12  recent, especially given the record as a whole, to support a conclusion that Dr. Jin's

13  opinion should be given "little weight." [Doc. No. 10-2, at p. 28.] In addition, as

14  previously noted, the record does not include any treatment records from Veterans

15  Village, and these records would have been highly relevant to determining whether

16  plaintiff's progress there was actually sufficient to support a finding that he had the

17  residual functional capacity to work.

18       Although the ALJ stated that plaintiff was "able to focus on his meetings and

19  residential tasks," there is no evidence in the record that includes any details about

20  the depth of plaintiff's ability to participate or "focus on his meetings." Nor is it

21  clear what the ALJ meant when he said plaintiff was able to focus on "residential

22  tasks." [Doc. No. 10-2, at p. 28.] Other than the fact that plaintiff was attending

23  therapy, the record does not include any significant evidence of his daily activities

24  or responsibilities at Veterans Village.  Nor is there any evidence in the record that

25  includes any details of what plaintiff meant when he said he had "recently" been

26  "phased up" and had taken on a leadership role.  Once again, treatment records from

27  Veterans Village would have included these details and other highly relevant

28  information.  The ALJ should have requested these records to determine whether

1   plaintiff's actual progress at Veterans Village, while his alcohol dependence was in

2   remission, was sufficient to support a finding that he had the residual functional

3   capacity to work.  It is true that plaintiff's testimony and the record as a whole do

4   indicate that plaintiff's symptoms improved during times when his alcohol abuse

5   was in remission, that he was involved in a treatment or rehabilitation program, and

6   that he wished to go to college.  However, his actual activities of daily living as

7   indicated in the record at the time of hearing – attending therapy sessions and

8   "recently" taking on a vague, undefined leadership role for an unspecified purpose –

9   are not daily activities indicative of a claimant's ability to work.  20 CFR Pt. 404,

10   Subpt. P, App. 1, Listing 12.00(C)(1) (indicating that relevant "[a]ctivities of daily

11   living include adaptive activities such as cleaning, shopping, cooking, taking public

12   transportation, paying bills, maintaining a residence, caring appropriately for your

13   grooming and hygiene . . . .  In the context of your overall situation, we assess the

14   quality of these activities by their independence, appropriateness, effectiveness, and

15   sustainability. . . .").

16         In deciding to give Dr. Jin's opinion "little weight," it is also unclear why the

17   ALJ relied so heavily on the selected testimony described above while ignoring or

18   discrediting the remainder of plaintiff's testimony, which supported Dr. Jin's

19   opinions.  As noted above, plaintiff also testified that he was taking the following

20   medications as prescribed by his treating physicians:  (1) Trazodone at night for

21   sleep; and (2) Zoloft or Sertraline. [Doc. No. 10-2, at p. 47.]  He did not believe the

22   medications were helping him very much as he did not get any "restorative sleep."

23   [Doc. No. 10-2, at p. 47.]  He had pain at 3:00 a.m. or 4:00 a.m. and he was not able

24   to sleep for long.  [Doc. No. 10-2, at pp. 47-48.]  However, he testified he was

25   unable to take pain medication in order to live at Veterans Village and participate in

26   the programs there. [Doc. No. 10-2, at pp. 47, 50.]  Instead, he was meditating and

27   using breathing techniques to control his pain that starts with cramps in his feet and

28   radiates up through his back. [Doc. No. 10-2, at p. 48.]  In addition, plaintiff said he

1   was being treated by an acupuncturist for pain twice a week, and the treatments

2   were "extremely effective." [Doc. No. 10-2, at pp. 48-51.] He also testified he

3   continued to have persistent symptoms of PTSD and was receiving cognitive

4   behavioral therapy to learn techniques to treat these symptoms. [Doc. No. 10-2, at

5   pp. 51-54.]

6        The record also shows that Dr. Jin, who specializes in psychiatry, treated

7   plaintiff for a significant length of time on a relatively regular and frequent basis.

8   More importantly, Dr. Jin's opinions about plaintiff's mental condition during

9   remission of his alcohol dependence are supported by other relevant evidence and

10  are consistent with the record as a whole.  When viewed as a whole, the record

11  shows that even when plaintiff's alcohol abuse was in remission for a significant

12  period of time he continued to suffer from mental health and other symptoms, such

13  as anxiety, depression, sleep deprivation, irritability, and pain, that would

14  significantly limit his residual functional capacity to do light work.  In this regard,

15  Dr. Jin's opinions are more consistent with the record as a whole than the ALJ's

16  conclusion that plaintiff's symptoms improved enough for him to do light work

17  when his alcohol use was in remission.  In sum, the ALJ's reasons for giving

18  Dr. Jin's opinions "little weight" did not qualify as "'specific and legitimate

19  reasons' supported by substantial evidence in the record." *Chaudhry v. Astrue*, 688

20  F.3d at 671. As a result, it is this Court's view that Dr. Jin's opinions were entitled

21  to significant, controlling weight.

22              *c.*    ***Other Medical Opinions.***

23       As noted above, the ALJ gave "little weight" or "some weight" to all

24  assessments by other treating or examining physicians, medical professionals, and

25  quasi-medical professionals who were familiar with plaintiff's mental and physical

26  health.  [Doc. No. 10-2, at pp. 26-29.] All of these opinions were essentially

27  supportive of and/or consistent with the record as a whole and the opinions of

28  Dr. Jin.  The ALJ gave these opinions "little weight" or "some weight" for the same

1   reasons he gave Dr. Jin's opinions "little weight." Therefore, for the reasons

2   outlined above, this Court finds that the ALJ's reasons for giving these other

3   opinions or assessments "little weight" or "some weight" did not qualify as

4   "'specific and legitimate reasons' supported by substantial evidence in the record."

5   *Chaudhry v. Astrue*, 688 F.3d at 671. In other words, it is this Court's view that

6   these opinions or assessments were entitled to more significant consideration by the

7   ALJ.

8                  **3.    *Physical Impairments and Chronic Pain Evidence.*

9          As noted above, the ALJ concluded plaintiff had the "severe" physical

10  impairments of knee arthralgia; lumbar spine compression fracture; history of heel

11  injury; and osteopenia. [Doc. No. 10-2, at p. 19.] The ALJ also found that these

12  impairments "cause more than minimal functional limitations." [Doc. No. 10-2, at p.

13  19.] The record is replete with evidence of severe, chronic pain from these

14  impairments over an extended period of time from as early as 2003 through

15  April 10, 2014, the date of the hearing before the ALJ. However, the ALJ did not

16  believe the objective medical evidence supported a finding that plaintiff's pain was

17  in any way disabling, even though the ALJ acknowledged that plaintiff used a cane

18  and stabilizing knee braces, had an antalgic gait, atrophy of his bilateral quads and

19  hamstrings, tenderness in his knees, and exaggerated pain response to palpitation in

20  his right heel. [Doc. No. 10-2, at p. 24.] In support of this conclusion, the ALJ

21  cited medical evidence indicating plaintiff had "only mild lumbar spine

22  degenerative changes" and "adequate strength and mobility." [Doc. No. 10-2, at p.

23  24.]

24          In addition, as noted above, Dr. Jonas testified the record is "very unclear" as

25  to any physical limitations, and Dr. Jonas was unable to determine whether plaintiff

26  had any "exertional limitations." [Doc. No. 10-2, at p. 60.] An ALJ's duty to

27  develop the record is triggered when there is ambiguous evidence or when the

28  record is inadequate to allow for proper evaluation of the evidence. *McLeod v.*

1    *Astrue*, 640 F.3d 881, 885 (9th Cir. 2010).  Despite the testimony of Dr. Jonas and

2    the alleged ambiguous state of the record, the ALJ concluded plaintiff retained the

3    exertional capacity for light work tasks. [Doc. No. 10-2, at p. 24.]

4         "In assessing the credibility of a claimant's testimony regarding subjective

5    pain or the intensity of symptoms, the ALJ engages in a two-step analysis. First, the

6    ALJ must determine whether there is objective medical evidence of an underlying

7    impairment which could reasonably be expected to produce the pain or other

8    symptoms alleged.  If the claimant has presented such evidence, and there is no

9    evidence of malingering, then the ALJ must give specific, clear and convincing

10   reasons in order to reject the claimant's testimony about the severity of the

11   symptoms.  At the same time, the ALJ is not required to believe every allegation of

12   disabling pain, or else disability benefits would be available for the asking, a result

13   plainly contrary to 42 U.S.C. § 423(d)(5)(A).  In evaluating the claimant's

14   testimony, the ALJ may use ordinary techniques of credibility evaluation." *Molina*

15   *v. Astrue*, 674 F.3d 1104, 1112-1113 (9th Cir. 2012) (internal citations and

16   quotations omitted).  "In weighing a claimant's credibility, the ALJ may consider his

17   reputation for truthfulness, inconsistencies either in his testimony or between his

18   testimony and his conduct, his daily activities, his work record, and testimony from

19   physicians and third parties concerning the nature, severity, and effect of the

20   symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792, as

21   amended on reh'g (9th Cir. 1997).

22        Here, the ALJ found that plaintiff's "medically determinable impairments

23   could reasonably be expected to produce the alleged [pain] symptoms" but also

24   concluded that plaintiff's "statements concerning the intensity, persistence and

25   limiting effects of these symptoms are not credible to the extent they are

26   inconsistent with the residual functional capacity" to perform unskilled light work

27   with minimal interaction with supervisors, coworkers and the public. [Doc. No. 10-

28   2, at pp. 23, 29.]

As noted above, plaintiff testified that he was taking Trazodone at night for sleep and Zoloft or Sertraline, but he did not believe these medications were helping him very much as he did not get any "restorative sleep." [Doc. No. 10-2, at p. 47.] He had pain at 3:00 a.m. or 4:00 a.m. and he was not able to sleep for long. [Doc. No. 10-2, at pp. 47-48.] In order to live at Veterans Village and participate in the programs there, he testified he was unable to take pain medication. [Doc. No. 10-2, at pp. 47, 50.] Instead, he was meditating and using breathing techniques to control his pain that starts with cramps in his feet and radiates up through his back. [Doc. No. 10-2, at p. 48.] In addition, plaintiff said he was being treated by an acupuncturist for pain twice a week, and the treatments were "extremely effective" in that the "basically mask[ed] the pain for a number of hours over the weekend." [Doc. No. 10-2, at pp. 48-51.] The acupuncturist explained that plaintiff reported relief when he was treated with acupuncture, but the relief was "fleeting." [Doc. No. 12-4, at p. 90.]

The ALJ's rejection of plaintiff's pain testimony disregards the very sizable record, summarized above, which is replete with plaintiff's frequent and consistent complaints over many years of severe pain from the injuries he sustained in the helicopter crash, prescriptions and refills for various types of pain medications from narcotics to analgesics, visits to a pain management specialist, numerous physical therapy appointments to address pain symptoms, caudal block/epidural steroid injections, and the use of a TENS unit. In addition, the nature and extent of plaintiff's pain treatments discredit the ALJ's characterization of plaintiff's pain treatment as routine or conservative.[20]

///

[20]   There are also repeated references in the record by plaintiff and medical professionals indicating that plaintiff admittedly used alcohol to relieve his chronic pain, which lead to alcohol dependence, and then to relapse following substance abuse treatment. Although excessive alcohol use cannot be condoned or supported by SSA regulations or by the Court, plaintiff's alcohol use does offer some additional proof of the chronic and severe nature of plaintiff's pain.

1    It appears the ALJ also found it significant that plaintiff indicated he was

2    doing "some exercise," including yoga, while living at Veterans Village. [Doc. No.

3    10-2, at p. 25; Doc. No. 12-4, at p. 95.] However, since physical therapists

4    previously recommended stretching to help with pain symptoms, plaintiff's

5    statement that he was doing yoga at Veterans Village does not in any way diminish

6    his consistent, long-term complaints of severe, chronic pain. Particularly given the

7    serious nature of plaintiff's heel and back injuries from a helicopter crash in 1995, it

8    is highly improbable that a plaintiff would seek and obtain so many different and

9    repeated treatments for pain if doctors and other trained professionals thought

10   plaintiff was faking. *See, e.g., Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640,

11   646, 647 (7th Cir. 2007).

12   The ALJ also rejected plaintiff's claims about the intensity, persistence, and

13   limiting effects of his symptoms for reasons of credibility. However, the ALJ did

14   not give specific, clear and convincing reasons for rejecting plaintiff's testimony and

15   claims of severe, chronic pain. For example, the ALJ questioned plaintiff's

16   credibility because of his testimony at the hearing that he was able to function as "a

17   ranch hand for a landowner up north" after the helicopter accident from 1995 to

18   2010 until there was a foreclosure of the land and was able to "ride the fences,"

19   check the perimeter, feed horses, take care of livestock, and clean the pool. [Doc.

20   No. 10-2, at pp. 46, 57-58.] Plaintiff also said he was able to help with payroll and

21   timekeeping at a sanitation company in 2006. [Doc. No. 10-2, at p. 25.]

22   According to the ALJ, plaintiff's testimony discredits his claims about the

23   severity of his pain symptoms, because it shows that he was able to work during this

24   time period even though his impairments were present at approximately the same

25   level and that he did not stop working because of his allegedly disabling

26   impairments. However, in applying these reasons to discredit plaintiff's claims of

27   disabling pain, the ALJ overlooked a key portion of plaintiff's testimony on this

28   subject. Plaintiff testified he was given "an electric cart" by the Department of

- 68 -

14cv2361-LAB(KSC)

1    Veterans Affairs when he was discharged from the Marine Corps, and this allowed
2    him to get around so he could function in the capacity of a ranch hand. In addition,
3    the value of this testimony in assessing plaintiff's credibility or his ability to work is
4    questionable. As explained above, plaintiff's work as a ranch hand is unverifiable
5    employment. In addition, there is other evidence in the record, as summarized
6    above, which indicates this employment was essentially an informal arrangement
7    with a girlfriend that plaintiff was living with during the time period in question.
8    The record does not include any evidence indicating how often or how well plaintiff
9    was able to perform the tasks he described in his testimony. In addition, medical
10   records for this time period indicate plaintiff was being treated for pain in his back,
11   leg, knees, ankle, and heel. This treatment included pain medication and caudal
12   block/epidural steroid injections. Plaintiff also complained of depression and
13   insomnia during this time period, and medical professionals indicated in their notes
14   they believed plaintiff may have attempted suicide on one or two occasions. In
15   short, plaintiff's testimony about his prior work as a ranch hand during the period
16   1995 to 2010 does not qualify as a specific, clear and convincing reason for rejecting
17   plaintiff's testimony and other evidence indicating he continued to suffer from
18   severe, chronic pain through the time of the hearing before the ALJ.
19        The ALJ also rejected plaintiff's testimony and other evidence about the
20   severity of plaintiff's pain because his treating providers indicated in medical
21   records that he was manipulative, malingered for shelter, and was drug-seeking and
22   dishonest, suggesting plaintiff may be misrepresenting the degree of his limitations.
23   [Doc. No. 10-2, at p. 25.] However, the evidence the ALJ relied on to conclude
24   plaintiff "malingered," was "dishonest," and "drug-seeking" is very weak, and in any
25   event, is associated with times when plaintiff was homeless and abusing alcohol, not
26   with times when his alcohol dependence was in remission. [Doc. No. 10-2, at p. 25.]
27   As summarized above, the record does indicate there was a brief period of time when
28   plaintiff's primary care physician was concerned about "drug seeking behavior,"

1   because plaintiff was seeking early refills for his narcotic pain medications and
2   would make excuses for doing so, such as a belief that someone at his homeless
3   shelter was taking his medications.  However, the records show that when plaintiff's
4   primary care physician referred him to a pain management specialist, who would no
5   longer prescribe narcotic medications, plaintiff showed a willingness to make regular
6   visits to the pain specialist and was generally compliant with a non-narcotic pain
7   regimen, which indicates plaintiff was not malingering.

8          As noted above, the record does include two separate, isolated notations to
9   malingering.  The first notation was made on October 19, 2010 by a staff physician
10  when she saw plaintiff for a "first time visit." [Doc. No. 10-7, at p. 14-15.] In a long
11  list of brief, unexplained notations, such as "r/o PSTD" and "r/o panic disorder," the
12  physician included "r/o malingering." [Doc. No. 10-7, at p. 15.] In the second
13  notation, a social worker stated in notes that plaintiff was likely "presenting for
14  shelter," suggesting he may have been embellishing his symptoms to obtain housing.
15  [Doc. No. 11-3, at pp. 110-111.]  However, these notations are mere snippets in a
16  large volume of medical records and are not clear evidence of malingering.  In this
17  regard, none of plaintiff's treating or examining doctors actually concluded that
18  plaintiff was malingering.  Nor did the ALJ make a clear, specific finding that
19  plaintiff was malingering.  As a result, the cited evidence is not enough to undermine
20  plaintiff's credibility. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

21         While it is true, as the ALJ stated in his opinion, that the record as a whole
22  does show that plaintiff's behavior, mood, and personality traits improve during
23  times when he is not abusing alcohol, this does not necessarily mean he has the
24  residual functional capacity for light work.  Rather, there is overwhelming evidence
25  in the record that even during times of sobriety, plaintiff continued to struggle with
26  pain symptoms, anxiety, sleep problems, and depression.  After an exhaustive review
27  of the entire administrative record in this case, it is apparent that the ALJ did not
28  fairly or thoroughly consider a large volume of medical evidence in reaching his

1 conclusion that plaintiff retained the residual functional capacity to perform light

2 work. In sum, the record as a whole does not support the ALJ's conclusion that

3 evidence concerning the intensity, persistence, and limiting effects of plaintiff's

4 chronic pain was not credible.

5                 **4.**   ***Disability Findings by Department of Veterans Affairs.***

6        The record includes evidence of two separate disability findings by the

7 Department of Veterans Affairs. The first is a letter dated September 8, 2010 from

8 the Department of Veterans Affairs stating that plaintiff was "entitled to

9 compensation for service-connected disability(ies) rated at least 10 percent, but less

10 than 30 percent." [Doc. No. 10-5, at p. 2.] Although the record does not include

11 official documentation outlining the reasons for this disability rating, it appears that

12 it was based on the physical injuries plaintiff sustained in the 1995 helicopter crash.

13 [Doc. No. 12-4, at p. 6.] This disability determination was made prior to October 6,

14 2003. [Doc. No. 12-4, at p. 6.]

15        The second disability determination was made in a letter from the Department

16 of Veterans Affairs dated April 4, 2014. This letter advised plaintiff of an increase

17 in his service connected compensation benefits to 80 percent effective March 1,

18 2014. [Doc. No. 10-6, at p. 63.] Seventy percent of this disability determination was

19 attributed to "depressive disorder." [Doc. No. 10-6, at p. 64.] An attached Rating

20 Decision dated April 3, 2014 lists the evidence used to increase plaintiff's disability

21 determination by 70 percent, including a Mental Disorders examination completed

22 on March 21, 2014. [Doc. No. 10-6, at pp. 69-70.] The Rating Decision also provides

23 detailed reasons for the finding of 80 percent disability. For example, the Rating

24 Decision explains that plaintiff's depressive disorder was directly connected to his

25 military service, since his service treatment records show he was treated for

26 situational depression in January 1995 and was also being treated for depression at

27 the time the rating decision was made in April 2014. [Doc. No. 10-6, at p. 70.]

28 Reasons listed for assigning a rating of 70 percent to plaintiff's depressive disorder

1   include:  difficulty in adapting to work, work like settings, and stressful

2   circumstances; suicidal ideation; disturbances of mood; impaired judgment;

3   difficulty in establishing and maintaining effective work and social relationships;

4   occupational and social impairment with reduced reliability and productivity;

5   chronic sleep impairment; and depressed mood.  [Doc. No. 10-6, at p. 70.]  However,

6   the Rating Decision defers any decision as to whether plaintiff is totally

7   unemployable pending "additional development." [Doc. No. 10-6, at p. 71.]

8        As noted above, a Mental Disorders Examination completed on March 21,

9   2014 was used as the basis for the increase in plaintiff's disability rating to a total of

10  80 percent.  This examination was completed by Lee Bowlus, M.D., a VA Staff

11  Psychatrist. [Doc. No. 10-6, at pp. 69-70; Doc. No. 12-4, at pp. 91-95.]  Dr. Bowlus

12  met with plaintiff in-person to complete the examination and also reviewed

13  plaintiff's claim file, VA medical records, and records from Veterans Village, where

14  plaintiff was residing at the time of the examination. [Doc. No. 12-4, at pp. 91, 94.]

15  During the examination, plaintiff told Dr. Bowlus that he had tried to work but "is in

16  a lot of pain and has muscle cramps." [Doc. No. 12-4, at p. 95.]

17        Based on his examination, Dr. Bowlus concluded plaintiff's claimed

18  depression "was at least as likely as not (50% or greater probability) incurred in or

19  caused by the claimed in-service injury, event or illness." [Doc. No. 12-4, at p. 92.]

20  Dr. Bowlus cited the following rationale for his conclusion: "[A]fter his helicopter

21  crash he was treated at NMC SD and noted to be depress[ed].  Since then he [has]

22  had on-going treatment for depression . . . and currently." [Doc. No. 12-4, at pp. 92,

23  95.]

24        Dr. Bowlus stated in his analysis that plaintiff was diagnosed with depressive

25  disorder and alcohol dependence, but he was currently sober. [Doc. No. 12-4, at p.

26  93.] According to Dr. Bowlus, it was possible to differentiate what symptoms were

27  attributable to each diagnosis – plaintiff's depression resulted in chronic low mood

28  ///

1   and the inability to feel pleasure, while his alcohol dependence resulted in excessive

2   alcohol consumption with physiologic dependence. [Doc. No. 12-4, at p. 93.]

3        "[A]lthough a VA rating of disability does not necessarily compel the SSA to

4   reach an identical results, 20 CFR § 404.1504, the ALJ must consider the VA's

5   finding in reaching his decision." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th

6   Cir. 2003). "[A]n ALJ must ordinarily give great weight to a VA determination of

7   disability." *Id.* In reaching this holding, the Ninth Circuit relied on "the marked

8   similarity between these two federal disability programs. Both programs serve the

9   same governmental purpose – providing benefits to those unable to work because of

10  a serious disability. ***Both programs evaluate a claimant's ability to perform***

11  ***full-time work in the national economy on a sustained and continuing basis; both***

12  ***focus on analyzing a claimant's functional limitations; and both require claimants***

13  ***to present extensive medical documentation in support of their claims.***" *Id.*

14  (emphasis added). However, because the criteria for determining disability are not

15  identical, "the ALJ may give less weight to a VA disability rating if he gives

16  persuasive, specific, valid reasons for doing so that are supported by the record." *Id.*

17       The ALJ gave "some weight" to the decision by the Department of Veterans

18  Affairs that plaintiff was entitled to a disability compensation rate of 80 percent for a

19  service connected disability of "depressive disorder." [Doc. No. 10-2, at p. 28.]

20  However, the ALJ concluded the decision by the Department of Veterans Affairs is

21  not dispositive for two reasons. First, the decision does not address whether plaintiff

22  is employable. Second, the decision does not appear to have considered the

23  materiality of plaintiff's history of substance abuse. [Doc. No. 10-2, at p. 28.]

24       The ALJ gave "little weight" to the opinion of Dr. Bowlus for the same

25  reasons he gave "little weight" to the opinion of Dr. Jin, plaintiff's VA treating

26  psychiatrist. [Doc. No. 10-2, at p. 28.] For the reasons outlined above, it is this

27  Court's view that the ALJ was not justified in giving Dr. Jin's opinion "little

28  ///

1  weight." [Doc. No. 10-2, at p. 28.] For the same reasons, it is this Court's view that

2  the ALJ was also not justified in giving "little weight" to the opinion of Dr. Bowlus.

3       The ALJ was justified in taking into consideration the fact that the VA

4  deferred any decision as to whether plaintiff is unemployable pending "additional

5  development." [Doc. No. 10-6, at p. 71.] It is also true that the VA's disability

6  determination did not specifically consider the materiality analysis required by SSA

7  regulations. However, the comprehensive Mental Disorders Examination completed

8  by Dr. Bowlus in connection with the VA's disability determination did state

9  plaintiff had been diagnosed with depressive disorder and alcohol dependence, and it

10  was possible to differentiate what symptoms were attributable to each diagnosis. His

11  conclusions about plaintiff's mental condition at the time were based on a diagnosis

12  of depression, not alcohol dependence. [Doc. No. 12-4, at pp. 93-94.]

13       Additionally, the Mental Disorders Examination conducted by Dr. Bowlus

14  was highly relevant to the ALJ's assessment of plaintiff's residual functional

15  capacity and materiality analysis. Dr. Bowlus specifically stated that he met with

16  plaintiff in person at Veterans Village after he had been sober and living in a sober

17  environment for some time. [Doc. No. 12-4, at pp. 91, 94.] His examination was also

18  based on a complete record, including the claim file, VA medical records, and

19  treatment records from Veterans Village, which do not appear to be included in the

20  record in this case. Dr. Bowlus specifically addressed issues highly relevant to the

21  ALJ's residual functional capacity assessment. Specifically, Dr. Bowlus concluded

22  that plaintiff's mental disorders reduced his reliability and productivity in

23  occupational and social situations. [Doc. No. 12-4, at p. 93.] Dr. Bowlus also noted

24  that plaintiff was currently being treated for PTSD and listed his symptoms as

25  follows: depressed mood; chronic sleep impairment; disturbance of motivation and

26  mood; difficulty in establishing and maintaining effective work and social

27  relationships; and difficulty in adapting to stressful circumstances, including work or

28  a work like setting; and chronic pain. [Doc. No. 12-4, at pp. 95-96.] Moreover, for

1   the reasons outlined in prior sections of this Report and Recommendation, the

2   opinions expressed by Dr. Bowlus are well supported by and consistent with the very

3   large volume of medical records that he reviewed to reach his conclusions.

4        Under the circumstances presented, it was not enough for the ALJ to give

5   "some weight" or "little weight" to the VA's disability determination and the

6   opinions of Dr. Bowlus.  These detailed findings and conclusions about plaintiff's

7   mental condition were not dispositive, as the ALJ stated in this decision, but they

8   were entitled to significant weight.

9      *V.*    ***Conclusion.***

10        A decision to remand for further investigation and development of the record

11   is appropriate when outstanding issues remain that must be resolved before a

12   determination of disability can be made.  *Treichler v. Comm'r of Social Sec. Admin.*,

13   775 F.3d 1090, 1106-1107 (9th Cir. 2014).  Based on the foregoing, this Court

14   concludes that a remand is appropriate in this case, because the ALJ's determination

15   that plaintiff is not disabled and has the residual functional capacity to do light work

16   is based on an incomplete record.  In this regard, the ALJ should have obtained

17   plaintiff's treatment records from Veterans Village for the time period October 1,

18   2013 through April 10, 2014, because these records were highly relevant to the

19   ALJ's analysis of whether alcoholism was a contributing factor material to the

20   disability determination.

21        Additionally, the ALJ did not properly weigh evidence and did not provide

22   legally sufficient reasons for his conclusion that plaintiff had the residual functional

23   capacity to do light work.  In this regard, the Court finds that the ALJ did not: (1)

24   consider whether plaintiff's depression met Listing 12.04, Affective Disorders, even

25   when his alcohol dependence was in remission; (2) provide legally sufficient reasons

26   for rejecting opinion evidence by treating physicians and other treating or examining

27   medical professionals concerning plaintiff's mental health; (3) give appropriate

28   weight to opinions of plaintiff's treating physician and other treating or examining

14cv2361-LAB(KSC)

physicians or medical professionals concerning plaintiff's mental health; (4) obtain clarification in the record as to plaintiff's physical and exertional limitations based on his severe physical impairments; (5) give legally sufficient reasons for rejecting evidence of severe, chronic pain from plaintiff's physical impairments; and (6) give appropriate weight to the disability findings by the Department of Veterans Affairs.

Based on the foregoing, IT IS HEREBY RECOMMENDED THAT THE DISTRICT COURT:

1.   GRANT plaintiff's Motion for Summary Judgment [Doc. No. 14];

2.   DENY defendant's Cross-Motion for Summary Judgment  [Doc. No. 19];

3.   REMAND the matter to the SSA for further consideration, investigation, and development of the record consistent with this Report and Recommendation; and

4.   ENTER judgment in plaintiff's favor.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local Rule 72.1(d).  Within ***fourteen (14) days*** after being served with a copy of this Report and Recommendation, "any party may serve and file written objections." 28 U.S.C. § 636(b)(1)(B)&(C).  The document should be captioned "Objections to Report and Recommendation."  The parties are advised that failure to file objections within this specific time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

**IT IS SO ORDERED.**

Date: _Feb. 10_ , 2016

KAREN S. CRAWFORD
United States Magistrate Judge